**STATE of Maine**

v.

**Barbara Thibodeau AYERS and Donald Ayers.**

Supreme Judicial Court of Maine.

Argued May 14, 1981.

Decided Aug. 5, 1981.

Charles K. Leadbetter, Herbert Bunker, Jr., Asst. Attys. Gen. (orally), Augusta, for plaintiff.

Bither & Goodwin, Thomas L. Goodwin (orally), Houlton, for Barbara Ayers.

Stevens, Engels & Bishop, Jonathan W. Sprague (orally), Richard C. Engels, Presque Isle, for Donald Ayers.

Before McKUSICK, C. J., and WERNICK, NICHOLS, ROBERTS and CARTER, JJ.

WERNICK, Justice.

Defendants Donald Ayers and Barbara Thibodeau Ayers[1] have appealed from judgments of conviction against them entered in the Superior Court (Aroostook County) on the verdict of a jury, returned in a joint trial, finding each of them guilty of Murder, 17–A M.R.S.A. § 201(1)(A), and of Conspiracy, 17–A M.R.S.A. § 151.

We sustain each defendant's appeal from the judgment of conviction of murder and set aside each said judgment. We deny each defendant's appeal from the judgment of conviction of conspiracy and affirm each said judgment.

On April 6 or 7, 1979, at Presque Isle, John Cheponis was shot and beaten to death in the back room of the J–P Cash Market, where he worked as night manager.

In the course of investigating the death of Cheponis, Presque Isle and Maine State Police questioned defendant Barbara, who was Cheponis' former wife, and defendant Donald, who was then Barbara's lover.

---

1. Donald Ayers and Barbara Marie Thibodeau were married after they were arrested in this case.

This questioning occurred on April 14, after Barbara and Donald chose to go to the Presque Isle Police Station for the purpose of obtaining from the police certain papers belonging to Cheponis. As soon as Barbara and Donald arrived at the station, officers separated them and proceeded to question each in the absence of the other.

Barbara was escorted by a detective Ferland of the Presque Isle Police to a small room used for interrogations, located on the second floor of the police station. Ferland first informed Barbara of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Acknowledging that she understood these rights, Barbara agreed to submit to questioning.

Detective Ferland quickly directed the interrogation to Barbara's relationship with Cheponis as well as with Donald Ayers. When Barbara's answer yielded some information that was apparently not consistent with information Donald had already given the police, Ferland left Barbara temporarily and went to confer in another room with the officer questioning Donald. On his return to resume questioning Barbara, Ferland told her about information regarding the crime that Donald had already given the police. Hearing this, Barbara became extremely agitated. She left the small interrogation room and went into a large, adjoining outer office, saying over and over that she wanted to see Donald. After Ferland told Barbara that Donald was no longer in the police station, which was the truth, Barbara started to walk toward a door leading downstairs. An officer not in uniform was standing either near, or in, this doorway. Neither Ferland nor the officer at the doorway tried to prevent Barbara from leaving, but each of them told her several times that Donald was no longer at the station.

In the outer office Barbara sat down in a chair and stared out a window for a few minutes, unresponsive to Ferland's calling of her name. Visibly distraught, she kept sobbing, apparently without tears. Soon, Ferland said to her

"Barbara, it's [referring to her display of emotion] not going to work this time. We are just going to wait until you are ready to talk."

Ferland continued to question Barbara while she was repeating her disbelief that Donald had made the statements Ferland attributed to him. In the course of Ferland's continued questioning Barbara admitted that she had killed John Cheponis.

During that same day, April 14th, Barbara spoke to police on several other occasions. Some of the conversations she initiated. As a result of Barbara's statements, police retrieved from the Aroostook River the gun used to kill John Cheponis.

During much of the time Barbara was being questioned by Detective Ferland, Donald Ayers was being interrogated in another area of the Presque Isle Police Station. Before questioning Donald, Maine State Police Sergeant Dale Ames advised him as follows:

"You have the absolute right to remain silent, you have the right to have an attorney here with you before any questioning, if you cannot afford an attorney, one will be provided for you and ... anything you say can and will be used against you in a court of law."

Sergeant Ames asked Donald if he understood what was thus explained to him and whether he would be willing to answer questions "without an attorney present." Donald answered "Yes" to both inquiries.

Sergeant Ames suggested to Donald, a Florida resident, that an earlier statement he had given to police, to the effect that he had never been in Maine before John Cheponis was killed, was not true. Donald thereupon admitted that he had met Barbara in Bangor some two weeks before the death of John Cheponis. He also admitted to Sergeant Ames that he had given Barbara a .22 caliber semi-automatic pistol, adding that he supposed that made him an accessory and that he would be arrested. Ames replied that at some point Donald would be arrested. Soon thereafter, Donald answered questions put to him with statements that incriminated him in conspiring with Barbara to kill Cheponis.

Sometime later, Donald agreed to accompany the police to Caribou for further questioning. After he was again given *Miranda* warnings, Donald fully described his involvement with Barbara in events preceding the killing of Cheponis.

Indicted for conspiracy, as well as for the murder of John Cheponis, Barbara and Donald were tried together for both crimes. At their joint trial the out-of-court confession of each defendant was admitted in evidence. Barbara and Donald each took the witness stand.

*1.*

■ At a hearing before trial, Barbara sought to suppress the confession she made to Detective Ferland. One ground of suppression she claimed was violation of her constitutional rights as implemented and safeguarded by *Miranda v. Arizona, supra.*

The "right to cut off questioning", as necessarily arising from the underlying right to remain silent in the first instance, is described by the Supreme Court in *Miranda* as follows:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or *during questioning*, that he wishes to remain silent, *the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in–custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

384 U.S. at 473–74, 86 S.Ct. at 1627–28.[2] (emphasis added)

The hearing justice ruled that when Barbara was told by Detective Ferland about the information Donald had given the police, her subsequent actions did not "indicate" that she wanted questioning to cease. The justice found her actions ambiguous, "capable of" being taken to signify either that she was reasserting her right to remain silent or that she was in a state of "extreme and understandable nervousness" consistent with a desire to take a "moment of contemplation before the decision to confess." Deeming it his prerogative as fact-finder to decide what Barbara's actual intent was, the hearing justice stated that he was

"convinced beyond a reasonable doubt that the second interpretation ... [was] the correct one."

Accordingly, the justice purported to find as fact that Barbara did not revoke her initial waiver and reassert her right to remain silent.

On this basis, the justice further concluded that the requirement of *Michigan v. Mosley*, 423 U.S. 96, 100–104, 96 S.Ct. 321, 324–327, 46 L.Ed.2d 313 (1975), as a further clarification and implementation of *Miranda*,—namely, that, *once claimed*, the right of a person in custodial confinement to stay silent, must be "scrupulously honored" before any further interrogation can take place—never came into play.

We agree with the hearing justice that *Mosley* is not applicable to the sequence of events in this case. *Mosley* held that interrogation of a person in custody who has "indicate[d] that 'he wishes to remain silent' " can be resumed in certain circumstances.[3] *Mosley*, however, does not pur-

---

**2.** The State conceded that Barbara was under custodial interrogation throughout, and the presiding justice concurred. The record provides rational support for the justice's finding that Barbara was being interrogated while deprived of her freedom in a significant way. *See Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *State v. Collins*, Me., 297 A.2d 620, 625 (1972).

**3.** In *Mosley*, the Supreme Court found that once a person in custody has exercised the right to remain silent, *Miranda* cannot sensibly be read to create a *per se* prohibition of indefinite duration against all further questioning. 423 U.S. at 103, 96 S.Ct. at 326. Questioning may be resumed if the person's *right to cut off questioning* has been "scrupulously honored." *Id.* at 104, 96 S.Ct. at 326–327. In the particular circumstances of *Mosely*,—where police ceased questioning the person in custody im-

port to delineate the appropriate procedures for police to use when a person in custody who has previously waived constitutional rights thereafter confronts the police with statements, or actions, that are ambiguous as a manifestation of the person's intent regarding further questioning and that *arguably* could be manifesting a revocation of the prior waiver and a reassertion of the constitutional rights that are the subject-matter of the *Miranda* warnings.

Some courts have dealt with this problem in situations roughly analogous to the one before us by imposing on interrogating officers a duty to clarify, through appropriate inquiries, whether the person in custody is in fact intending to invoke any of the constitutional protections that are the subject-matter of the *Miranda* warnings. *See, e. g., United States v. Riggs*, 537 F.2d 1219, 1222 (4th Cir. 1976); *United States v. Nielsen*, 392 F.2d 849, 853 (7th Cir. 1968); *United States v. Chansriharaj*, 446 F.Supp. 107, 109 (S.D.N.Y.1978); *Taylor v. Riddle*, 409 F.Supp. 631, 635–636 (W.D.Va.1976), aff'd 563 F.2d 133 (4th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978); *Cf. Thompson v. Wainwright*, 601 F.2d 768, 771–772 (5th Cir. 1979); but see

*Reeves v. State*, 241 Ga. 44, 243 S.E.2d 24, *cert. denied*, 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978); *State v. House*, 54 Ohio St.2d 297, 376 N.E.2d 588 (1978).

We find no need in the case at bar to seek to delineate in detail the nature, scope, or limits, of the questioning police may undertake when they confront ambiguous conduct by a person in custody that could *arguably* be an "indication" of a wish to have questioning terminate.

In such circumstances whatever it be that the police may do, what they surely cannot do—consistently with the Constitution—is to deny the person in custody the opportunity to retract a previously given waiver and to reassert the right to be silent. Here, Detective Ferland did precisely what is thus prohibited when he said to Barbara:

"it's not going to work this time. *We are just going to wait until you are ready to talk*." (emphasis added)

His message to Barbara was that he would not allow her to do what the *Miranda* warning told her, and guaranteed to her, that she could do: terminate questioning whenever she wished.[4]

---

mediately upon his invocation of his right to silence, where questioning resumed after a significant lapse of time, where a second set of warnings had been administered, and where the second interrogation concerned a crime unrelated to the first—there was no violation of constitutional rights and the statements made to police were held admissible at trial. In short, *Mosely* suggests the limits of permissible questioning *after* a suspect has, *without ambiguity, in fact* manifested intention to remain silent.

4. That this interpretation of Detective Ferland's statement to Barbara is the only possible gloss on his words became abundantly clear from Detective Ferland's testimony at trial. When queried about his words "it is not going to work *this time*" (emphasis added), Ferland explained that he had questioned Barbara about an unrelated incident sometime before the current investigation and that she had thwarted the interrogation by a display of emotion. Ferland described the previous incident in this fashion:

"(By Defense Counsel): ... Can you explain what you meant to be conveyed by that?
"(By Det. Ferland): Just that she stopped in Van Buren, and I kept talking to her and I got

no response. So I was not going to sit there and try to get her to talk. I just said simply, Barbara, it is not going to work this time, in my own mind I am not going to play that game this time, I am just going to sit here and wait until you are ready.
"(By Defense Counsel): The previous time it had worked because you had given up talking to her, is that correct?
"(By Det. Ferland): No, that is not what I am saying. What I am saying is that I had continued to try to get her to talk in Van Buren. For a period of time, the more I tried to get her to talk, the more reluctant she became not to. So this time my inference was that I am not going to do that, I am going to sit here and wait until you are ready to talk."

*Miranda's* mandate is that questioning must cease if a person in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." 384 U.S. at 473–74, 86 S.Ct. at 1627–28. It is clear from Detective Ferland's testimony that he understood Barbara's actions, both during the earlier incident and during the current investigation, to be attempts to stop interrogation and that he had no intention of allowing her to do so.

This, then, is not a case like *State v. Ladd*, Me., 431 A.2d 60 (1981), recently decided by us, in which the police questions and statements were directed to clarifying whether the intention of the person in custody was to remain silent. Here, the police made clear to Barbara that they were insisting that she talk and that they would persist in making sure that she would resume answering their questions.

It is, therefore, plain to us that in order for the hearing justice rationally to find beyond a reasonable doubt, as he purported to do, that Barbara had not asserted her right to cut off questioning and remain silent, the justice must have ignored Ferland's preemptive statement to Barbara and must have looked only to the nature of Barbara's conduct *prior* to that statement. It was, therefore, error of law, even if there was ambiguity in what Barbara may have been contemplating in her moments of silence and sobbing, for the hearing justice to overlook, ignore, or treat as insignificant, that Detective Ferland himself unilaterally, unequivocally, and unconstitutionally had resolved the ambiguity in Barbara's actions, by making explicitly plain to Barbara that it would be futile for her to seek to retract her prior waiver and to reassert her constitutional right to cut off questioning and resume silence. It was after she was thus foreclosed by Detective Ferland that Barbara answered Ferland's further questions.

■ Barbara's out-of-court confession to Detective Ferland was thus obtained in violation of her constitutional rights, and he should not have been permitted, through his testimony, to present it as evidence against her at the trial for murder.

Because of this error, the judgment of conviction of murder against Barbara cannot stand and must be set aside. We cannot hold this error harmless beyond a reasonable doubt even though Barbara took the witness stand and, in effect, gave an in-court confession as to the murder of John Cheponis that was substantially the same as her illegally procured out-of-court confession. Under *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) Barbara's in-court testimony may *not* be taken into account against her if it was in fact "fruit of the poisonous tree", as having been testimony she was "impelled" to give because of the erroneous admission in evidence of the out-of-court confession by her that had been illegally procured. *Cf. Smith v. Estelle*, 527 F.2d 430 (5th Cir. 1976); *Hillard v. State*, 286 Md. 145, 406 A.2d 415 (1979); *People v. Wilson*, 60 Ill.2d 235, 326 N.E.2d 378 (1975). Here, we cannot say that Barbara's in-court testimony was not the "fruit of the poisonous tree" of her illegally procured out-of-court confession. Hence, we cannot resort to her in-court testimony as a basis for holding the erroneous admission in evidence of her out-of-court confession harmless error beyond a reasonable doubt. Nor can we say that the other evidence of murder against Barbara independent of her own testimony made that error harmless beyond a reasonable doubt.

Since we must set aside the judgment convicting Barbara of murder, the question arises whether we must also set aside the judgment convicting Donald of murder—that judgment being supportable in the circumstances disclosed by the record before us only on the rationale that even though Donald was in Florida when Barbara murdered John Cheponis in Maine, Donald was guilty of murder as an "accomplice" of Barbara by reason of his having planned the murder with her.

■ Donald could be guilty of murder as an accomplice of Barbara only if competent evidence properly admissible against Donald showed beyond a reasonable doubt that Barbara had murdered John Cheponis.

We recognize that a highly refined technical argument may be made that (1) Donald lacks standing to complain of the police violation of Barbara's *Miranda*-protected constitutional rights and, therefore, (2) Donald lacks standing to have excluded as evidence against him Barbara's in-court testimony. On this rationale, Barbara's in-court testimony admissible against Donald would support the conclusion that, for the purpose of finding Donald guilty of murder

as Barbara's accomplice, it had been proved beyond a reasonable doubt that Barbara had murdered John Cheponis.

Our view, however, is that to resort to such an analysis to save the conviction of Donald of murder would be contrary to the interests of justice in all the circumstances of this case.

The pre-trial and trial records reveal that the entire structure of the *joint* trial of Barbara and Donald was molded by the existence and admission at trial of extra-judicial confessions made by each defendant. This being so, we cannot indulge in after-the-fact assumptions at the appellate level regarding what would, or might, have happened had Barbara's out-of-court confession of murder been originally suppressed, as we have now decided it should have been. Thus, we can make no valid assumption whether, had Barbara's confession been suppressed, the Superior Court would have ordered separate trials or whether the prosecution would have wanted separate trials rather than a joint trial. The critical reality was, and it cannot fairly be ignored or assumed out of existence by after-the-fact analysis, that Barbara's in-court testimony was given at a *joint* trial of Barbara and Donald and that had it not been for the legal error that Barbara's out-of-court confession of murdering John Cheponis was not suppressed, Barbara's in-court testimony may never have been given, to be available for use against Donald (or Barbara).

▌ Moreover, we cannot overlook that even if Donald lacks standing to complain of the error in the refusal to suppress Barbara's extra-judicial confession of murder, and of that error's consequent "fruit of the poisonous tree" taint upon her in-court testimony, that error could project a violation of Donald's constitutional right to be confronted by a witness against him, as to which Donald would have standing to com-

plain. Plainly, our decision that Barbara's extra-judicial confession should have been suppressed invalidates the rationale of "interlocking" admissible confessions, *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), on which the presiding justice concluded that it was consistent with confrontation rights to allow Barbara's out-of-court confession of murder in evidence against her at a *joint* trial of Barbara and Donald for murder.

Further, as we have already decided, the error in not suppressing Barbara's out-of-court confession requires that we place no reliance on Barbara's having taken the witness stand as a basis for convicting her of murder, her taking the stand having been, potentially, tainted as "fruit of the poisonous tree." It hardly seems just, then, to resort after the fact to the existence of that potentially tainted in-court testimony, to bring into play *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971) as the means of avoiding any confrontation difficulty relative to Donald's conviction of murder.[5]

▌ In the totality of these particular and special circumstances, then, we must conclude that fairness and justice are better served by our deciding, as we do, to set aside the judgment of conviction of murder against Donald because we are constitutionally obliged to set aside the judgment of conviction of murder against Barbara.

### 2.

Two issues Donald has raised in this appeal regarding instructions to the jury will arise again upon a retrial of Donald for murder. We therefore discuss those issues in the interest of judicial economy.

Donald has claimed error in the presiding justice's instruction to the jury regarding guilt as an accomplice. At the close of all the evidence, Donald requested an instruc-

---

5. Such a confrontation problem might arise because, in evaluating whether Donald was guilty of murder as Barbara's accomplice, the jury could not be expected to disregard Barbara's out-of-court confession that she had murdered Cheponis.

Most interesting in this regard, by analogy, is the position taken by the Solicitor General of the United States "in the interests of justice" described in *Bruton v. United States*, 391 U.S. 123, 125, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

tion to the effect that he could be found guilty of murder only if the jury found that Barbara shot John Cheponis and that Donald was "actually or constructively present" when the shooting occurred.[6] The presiding justice refused to give such an instruction. The justice was correct.

■ The pertinent sections of the Maine Criminal Code governing accomplice liability are 17–A M.R.S.A. §§ 57(1), (2)(C), and 3(A). The Code concept is that of "legal accountability." A person may be convicted of a crime committed through the conduct of another if he is "legally accountable" for the crime. One incurs "legal accountability" for the conduct of another by acting as an "accomplice", as defined in Section 57(3)(A), by soliciting or by aiding or agreeing to aid or attempting to aid in planning or committing a crime, with the intent of promoting or facilitating the commission of the crime. *See State v. Kimball*, Me., 424 A.2d 684 (1981); *State v. Anderson*, Me., 409 A.2d 1290, 1303 (1979). Thus, under the Code, to be legally accountable as an accomplice for the criminal act of another, it is not necessary that a person be actually or constructively present at the scene of a crime, *see State v. Porter*, Me., 404 A.2d 590 (1979); *see also State v. Kimball, supra,* and *State v. Anderson, supra.*

■ That legal accountability for the criminal conduct of another does not depend on the actual or constructive presence of the accomplice becomes even clearer when we examine the provision in Section 57 placing a limitation on accomplice liability. Pursuant to Section 57(5)(C)(2), a person is not an accomplice to a crime if he terminates his complicity prior to commission of the crime, by informing his accomplice that he has abandoned the criminal activity and by

"leaving the scene of the prospective crime, *if he is present thereat.*" (emphasis added)

6. It is undisputed that Donald Ayers was in Florida on the night of John Cheponis' death.

7. In prosecutions controlled by the Code, then, the State would be well advised to submit re-

The language "if he is present thereat" patently carries the negative implication that to be legally accountable as an accomplice one need *not* be present at the scene of the crime.

The presiding justice, therefore, was correct in refusing to instruct the jury as Donald Ayers requested.

■ Donald also objected to a portion of the presiding justice's instructions to the jury in which the justice stated:

"The slightest degree of collusion or assistance in the planning or perpetration is sufficient [to support a verdict of guilty of murder as an accomplice of Barbara]. You may take into account the conduct of the Defendant Donald Ayers, before and after the time that the State alleges the crime of murder was committed, as well as his relationship with the perpetrator . . . ."

Although instructions approximating the foregoing were approved by this Court in cases antedating the Criminal Code, *see State v. Mower*, Me., 317 A.2d 807, 812 (1974); *State v. Berube*, 158 Me. 433, 435–36, 185 A.2d 900, 902 (1962), those cases are no longer authoritative. The language of Section 57 of the Criminal Code explicitly and amply defines the current law applicable to accomplice liability and provides a framework for jury instructions vastly preferable to, and superseding, that provided by cases decided on the basis of pre-Code criminal statutes.[7]

### 3.

We affirm the judgment of conviction of conspiracy against each defendant.

We discuss, first, the judgment convicting Donald of conspiracy.

As one ground of attack on that judgment Donald contends that his out-of-court admissions incriminating him in a conspiracy with Barbara regarding the death of

quests for instructions that reflect, and are in accordance with, the "accountability" concepts of the Code rather than the legal approaches in vogue before the Code became effective.

John Cheponis were obtained from him by Maine State Police Sergeant Dale Ames in violation of his rights under *Miranda v. Arizona, supra.* Were this correct, the further consequence would be, under *Harrison v. United States, supra,* that we could not ignore the "fruit of the poisonous tree" taint attaching to his in-court testimony of conspiracy. Donald's claim of a *Miranda* violation centers on the failure of Sergeant Ames to inform him that he had a right to have counsel present at all times *during* his being questioned.[8]

■ At a pre-trial hearing on Donald's motion to suppress his out-of-court incriminating statements, the justice found as facts that Sergeant Ames had clearly told Donald he had the right to have an attorney present *before* police questioning began and that Ames then asked Donald if he would be willing to talk "without having an attorney present." The justice found that Ames' initial warning, coupled with the subsequent question, both put to Donald before any interrogation was conducted, sufficiently informed Donald of his rights under *Miranda.* We agree.

■ Although some courts have required, strictly, that a person in custody be informed specifically of his right to the presence of an attorney during questioning, *see, e. g., United States v. Oliver,* 421 F.2d 1034 (10th Cir. 1970); *Windsor v. United States,* 389 F.2d 530 (5th Cir. 1968), we regard as better reasoned those cases holding that *Miranda* does not contemplate a "ritualistic recital" but rather, is directed to insuring that the substance of the constitutional rights of a person in custody be intelligibly conveyed to him. *People v. Prim,* 53 Ill.2d 62, 289 N.E.2d 601, 604–605 (1972); *see also United States v. Lamia,* 429 F.2d 373, 376–77 (2d Cir.), *cert. denied,* 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970); *People v. Watkins,* 60 Mich.App. 124, 230 N.W.2d 338, 340–41 (1975); *People v. Gilleylem,* 34 Mich.App. 393, 191 N.W.2d 96, 97 (1971).

■ The hearing justice found, beyond a reasonable doubt, that Donald was adequately informed of his rights under *Miranda,* that he understood those rights, and that he knowingly, intelligently and voluntarily waived them. *See State v. Collins,* Me., 297 A.2d 620, 625 (1972). The record supports such findings. Donald Ayers' initial out-of-court incriminating statements were, therefore, admissible against him at trial, as were subsequent statements he made after receiving further, concededly complete but unnecessary, *Miranda* warnings. *See State v. Myers,* Me., 345 A.2d 500, 502 (1975).

Thus, Donald's out-of-court confession of conspiracy was admissible in evidence against him, and his in-court admissions of conspiracy were admissible for all purposes of the trial. Donald's guilt of the crime of conspiracy was, therefore, amply shown.[9]

We affirm, too, the judgment convicting Barbara of conspiracy.

■ Since Barbara's illegally obtained extra-judicial statements to Detective Ferland made no mention of a conspiracy, the

---

8. The State, while conceding that Sergeant Ames was "interrogating" Donald, *see Rhode Island v. Innis, supra,* 446 U.S. at 301, 100 S.Ct. at 1690 (1980), has argued that Donald was not in "custody" at the time of his initial admissions and that hence *Miranda* warnings were not required at all. The presiding justice, however, found that the interrogation of Donald had become custodial at the point where Donald was informed that he would be arrested. *See State v. Preston,* Me., 411 A.2d 402, 405 (1980); *State v. Inman,* Me., 350 A.2d 582, 592–98 (1976). The record provides rational support for the justice's finding that at that point the line between general investigation and custodial interrogation had been crossed. *See State v. Inman, supra,* 350 A.2d at 597–98;

*State v. Collins, supra,* 297 A.2d 620, 625 (1972). Because Sergeant Ames gave Donald no new *Miranda* warnings at the time when interrogation became custodial, the issue here is whether the *Miranda* warnings given by Ames at the beginning of interrogation were sufficient.

9. The erroneous admission in evidence of Barbara's illegally obtained out-of-court statements create no *Bruton* difficulty regarding Donald's conviction of conspiracy, since Barbara's out-of-court statements dealt only with Barbara's having killed Cheponis and carefully avoided implicating Donald in a conspiracy.

admission of the statements in evidence had no rational bearing on the conspiracy conviction and, therefore, was harmless as to that conviction.

■■■■ Barbara's in-court testimony, however, did refer to various aspects of the prior planning between Donald and her to kill John Cheponis. We will assume, without now deciding, that the *Harrison v. United States* "fruit of the poisonous tree" taint upon Barbara's in-court testimony, arising from the illegality in the procuring of her out-of-court confession of murder, affects her in-court testimony as to conspiracy as well as murder.[10] Even so, the independent and correctly admitted evidence of conspiracy between Barbara and Donald was so overwhelming that we have no hesitation in saying that the error, if any, in the jury's hearing Barbara's in-court testimonial references to the existence of a conspiracy was, beyond a reasonable doubt, harmless.[11]

The entries shall be:

(1) Each judgment of conviction of conspiracy is affirmed.

(2) Each judgment of conviction of murder is set aside.

(3) The case is remanded to the Superior Court for further appropriate proceedings consistent with the opinion herein.

All concurring.

10. The argument favoring this approach would be that *Harrison v. United States* seems to rest on the rationale that Barbara may not have testified *at all* but for the erroneous failure to suppress as evidence her illegally procured extra-judicial confession of murder.

11. This independent evidence included not only various incriminating letters written by Barbara but also Donald's in-court testimony, admissible for all purposes of the trial, setting out the full details of the planning by Barbara and Donald to kill John Cheponis.

Moreover, because Donald's testifying at trial was not subject to taint under *Harrison v. United States, supra,* (as was Barbara's having taken the witness stand) Barbara cannot claim unfairness in our resorting to *Nelson v. O'Neil, supra,* to establish that there was no *Bruton* violation as to Barbara in the jury's having been permitted to hear Donald's out-of-court confession of having conspired with her.