STATE of Maine

v.

William MARDEN.

Supreme Judicial Court of Maine.

Submitted on Briefs Sept. 22, 1995.

Decided Feb. 7, 1996.

R. Christopher Almy, District Attorney, Jeffrey M. Silverstein, Assistant District Attorney, Bangor, for the State.

Mark A. Perry, Archer, Perry and Jordan, P.A., Brewer, for Defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

DANA, Justice.

William Marden appeals from a judgment of conviction and his sentence entered in the Superior Court (Penobscot County, Krav-chuk, J.) on a jury verdict finding him guilty of arson, 17–A M.R.S.A. § 802 (1983 & Supp. 1995). Marden contends that the judge abused her discretion when she failed to recuse herself and erred in denying his motion to suppress statements he made to the police. He also contends that it was obvious error for a police detective to give an expert opinion as to the source of smoke on Marden's sleeve, and that there was insufficient evidence to support his conviction. Finally, Marden contends that the sentence is excessive. We affirm the judgment and vacate the sentence.

The following evidence was submitted to the jury. On the evening of January 4, 1992, a fire occurred at 50 Ohio Street in Bangor. A state fire investigator concluded that the fire was intentionally set. A tenant at 50 Ohio Street who lived on the second floor across the hall from Cheryl Cole, Marden's ex-girlfriend, heard people leaving Cole's apartment at approximately 7:15 or 7:30 p.m. At approximately 9 p.m. the tenant heard someone coming up the stairs and then, after a few minutes, run down the stairs. Three to five minutes later the smoke detector went off. When the tenant went into the hallway she saw smoke coming out of Cole's apartment, and called the fire department.

Earlier in the evening, Cole, Marden, and others were drinking in Marden's apartment at 15 Union Place, which is directly behind 50 Ohio Street. Marden appeared angry because Cole was sitting on another man's lap and flirting with him. Marden left his apartment at approximately 7:00 p.m. There was conflicting testimony regarding what time Marden returned.[1] Soon after Marden returned to his apartment fire trucks arrived at 50 Ohio Street. Two witnesses testified that Marden visited them at their apartment at approximately 6:40 p.m. and left at 8:40 p.m.

A police officer who directed traffic at the fire scene testified that Marden approached him wearing a denim jacket and blue jeans, and appeared intoxicated and angry. A de-

---

1. There was testimony that Marden was gone for half an hour, and when he returned he changed his shirt and left again, stating that he was going to a tavern. One witness testified that Marden returned to the apartment at about 8:45 p.m. and did not change his clothes. Another witness testified that Marden was gone an hour to an hour and a half, and seemed nervous when he returned.

tective of the Bangor Police Department interviewed Marden that evening. Marden told the detective that he had been partying at his apartment, left, and visited friends for 10–15 minutes. Marden said he then returned and changed his clothes, stayed for 20 minutes, and then left again for another 10–15 minutes to go to a tavern. Marden explained that a neighbor had told him about the fire when he returned, and he went to the scene to investigate. Marden also told the detective that he was not upset with Cole or anyone at the party. The police seized Marden's jacket.

## I. *Recusal*

■ Marden contends that the trial judge erred when she denied his motion for recusal on the grounds that she was biased against him because she was acquainted with the owner of the apartment building where the fire occurred and she had prosecuted Marden for juvenile crimes in her former capacity as an assistant district attorney.

■ "[N]o judge should preside in a case in which he is not wholly free, disinterested, impartial and independent." *In re Bernard*, 408 A.2d 1279, 1282 (Me.1979) (citing *Norton v. Inhabitants of Fayette*, 134 Me. 468, 470, 188 A. 281, 282 (1936)). This principle conforms with a criminal defendant's due process rights provided by the state and federal constitutions. *In re Bernard*, 408 A.2d at 1282. A judge who previously acted as one of the party's attorneys cannot then sit in judgment to determine the rights of both parties to the same cause. *Norton*, 134 Me. at 471, 188 A. at 282. The fact that a judge was a prosecutor in a previous prosecution of the defendant, however, has been held not to disqualify her from sitting. *See* 48A C.J.S. *Judges* § 114 (1981). Recusal is a matter within the broad discretion of the trial court. *Estate of Tingley*, 610 A.2d 266, 267 (Me.1992). There is nothing in this record to indicate that the judge did not render her decisions and orders impartially. *See Estate of Tingley*, 610 A.2d at 267 (probate judge did not abuse his discretion in

declining to disqualify himself because his nephew was on hospital board that filed claim against the estate where orders were not tainted by judicial bias or prejudice). Because the judge in this case disclosed to the parties her acquaintanceship with the building owner whose participation in the case was minimal, and because their acquaintanceship was slight, she acted within her discretion in denying Marden's motion.

## II. *Motion to Suppress*

Marden moved to suppress the statements he made to the police on the basis that they were obtained in violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court denied Marden's motion.

■ Marden first contends that a detective misstated the warnings required by *Miranda* when he told Marden that he had the right to stop answering questions because *Miranda* requires that the interrogation must stop if the defendant invokes his right to remain silent.[2] We review a trial court's finding as to *Miranda* issues for clear error. *State v. Cooper*, 617 A.2d 1011, 1013 (Me. 1992). A finding is clearly erroneous only if there is no competent evidence in the record to support it. *State v. Navarro*, 621 A.2d 408, 413 (Me.1993). The State must prove by a preponderance of the evidence that the *Miranda* rights were properly read to the suspect. *State v. Hewes*, 558 A.2d 696, 700 (Me.1989).

■ "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. Once the warning has been given *Miranda* requires that if the defendant indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent the interrogation must cease. *Id.* at 473–74,

---

2. The relevant portion of the *Miranda* warnings stated by the detective were: "If you decide to answer questions now with or without a lawyer present you have the right to stop answering at any time or to stop answering ... OK, or to stop answering at any time until you can talk to a lawyer."

86 S.Ct. at 1627–28. If the defendant indicates that he wants an attorney the interrogation must cease until an attorney is present. *Id.*

Marden's right to cut off questioning was arguably misstated by the detective when he stated that if Marden invoked his right to silence or right to an attorney he had the right to stop *answering* questions, because it is the *interrogation* that must cease. In *State v. Ayers,* 433 A.2d 356, 365 (Me.1981), *cert. denied,* 466 U.S. 941, 104 S.Ct. 1919, 80 L.Ed.2d 466 (1984), however, we endorsed the reasoning that "*Miranda* does not contemplate a 'ritualistic recital' but rather, is directed to insuring that the substance of the constitutional rights of a person in custody be intelligibly conveyed to him." In *Ayers* we concluded that although the sergeant failed to inform the defendant that he had a right to have counsel present at all times during questioning the defendant was adequately informed of his *Miranda* rights. *Id.* (citations omitted).

We conclude in the instant case that Marden was sufficiently informed of the substance of his *Miranda* rights. On review of the record, Marden's responses and his summaries of the meaning of the warnings indicate that he understood his rights to silence and to counsel and the consequences of waiving those rights.[3]

■ Marden also contends that he did not knowingly and voluntarily waive his *Miranda* rights because as a man with minimal education he was interrogated late at night after he had been drinking all day, was agitated and in pain, and misunderstood his right to counsel and his right to terminate the questioning.

■ The State has the burden of proving by a preponderance of the evidence that the accused's waiver of his *Miranda* rights was made "knowingly, understandingly, and voluntarily." *State v. Leone,* 581 A.2d 394, 397 (Me.1990). After the detective read each warning he made sure Marden understood

them by asking Marden to explain what each one meant to him. Marden signed a *Miranda*-waiver sheet acknowledging that he understood his *Miranda* rights and agreed to submit to questioning at that time without an attorney present. Even if Marden were intoxicated it does not necessarily mean he was unable to understand and voluntarily waive his constitutional rights. *See Cooper,* 617 A.2d at 1013–14 (accused voluntarily waived his *Miranda* rights notwithstanding evidence he smoked marijuana and crack); *State v. Clark,* 475 A.2d 418, 420 (Me.1984) (intoxicated defendant is not necessarily incapable of waiving constitutional rights or giving voluntary statement). The evidence rationally supports the court's finding that Marden waived his *Miranda* rights.

■ Marden next contends that the detective failed to terminate the interrogation when Marden invoked his right to remain silent by saying "no comment," and that the detective's warning to Marden that he could "sit here all night with Marden saying no comment to every question" denied him his right to retract his waiver and reassert his right to remain silent.

■ The "right to cut off questioning" is described in *Miranda* as follows:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questions, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28. In this case, after the *Miranda* warnings were read to Marden and he agreed to submit to questioning he respond-

---

3. In response to the warning regarding his right to remain silent, Marden explained that "it means that if I don't want to say something I don't have to answer it," and in response to the warning regarding his right to an attorney he stated "it means if I don't want to talk to you I can say hey I want a lawyer or I don't want to answer the question."

ed "no comment" to several questions at the commencement of the interrogation. The following colloquy then occurred:

Q: OK. Let met ask you a question[ ] Billy. Are you going to answer any of my questions?

A: I might. Maybe.

Q: Would you tell me which type of questions you would answer so I don't ... I don't sit here all night with you saying no comment?

A: You just gotta do your investigation right?

Q: That's right.

A: I'm pissed. Do your investigation.

Q: Billy I can sit here all night with you and have you just say no comment to every question I ask.

A: Maybe not. Maybe not.

Q: It appears that it's just going to be a waste of time if you're not going to talk to me.

A: I might talk to you. I might not. Just keep going and get it over with.

It was ambiguous whether Marden's "no comment" responses meant that he was invoking his right to silence. His responses viewed individually only indicated his desire not to answer the particular question asked, not that he wanted the questioning to stop. Indeed, the detective considered that his responses could be an invocation of his right to silence and attempted to resolve the ambiguity by his subsequent questions and statements. Police may undertake questioning of a suspect in custody to attempt to clarify ambiguous conduct that could arguably be an indication of a desire to have questioning cease. *See Ayers,* 433 A.2d at 361 (finding no need to set forth in detail the nature, scope, or limits of the questioning police may undertake when suspect's conduct is ambiguous regarding whether he intends to have questioning cease); *State v. Ladd,* 431 A.2d

60, 62–63 (Me.1981), *cert. denied,* 454 U.S. 1101, 102 S.Ct. 677, 70 L.Ed.2d 643 (1981), (in face of defendant's ambiguous statement police officer was entitled to make limited inquiry for the purpose of clarifying whether defendant was invoking his right to remain silent). In attempting to resolve the ambiguity, however, the police cannot "deny the person in custody the opportunity to retract a previously given waiver and to reassert the right to be silent." *Ayers,* 433 A.2d at 361.[4]

Here, the detective's statements and questions following Marden's "no comment" responses were acceptable attempts to clarify what could be characterized as an ambiguous invocation of his right to silence. The court's implicit finding that the detective's questions were not threats of an all night interrogation is not clearly erroneous. Nor is there error in the court's finding that Marden did not clearly and unequivocally indicate that he did not want to answer any more questions.

■■■ Marden also contends that his statements were not voluntarily given because he was vulnerable due to his physical and mental condition, limited education, prisoner status, and because of the lateness of the hour. Marden contends that his choice to remain silent was overcome by police coercion in the form of promising to look into his custodial status if he cooperated with the interview and by the detective's refusal to terminate the questioning when Marden refused to answer questions.

■■■ We review for clear error the trial court's finding that the State met its burden as to the voluntariness of the defendant's statement. *State v. Graves,* 638 A.2d 734, 736 (Me.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994). The State must prove beyond a reasonable doubt that the defendant's statements were voluntary. *Id.* The trial court must consider the totality of the circumstances in deter-

---

4. In *Ayers* the police officer, after the accused failed to respond to him and was sobbing, told her that "it's not going to work this time. We are just going to wait until you are ready to talk." *State v. Ayers,* 433 A.2d 356, 361 (1981), *cert. denied.* 466 U.S. 941, 104 S.Ct. 1919, 80 L.Ed.2d 466 (1984). We held that the police officer unconstitutionally resolved the ambiguity of wheth-

er the accused had asserted her right to cut off questioning and remain silent by making it clear to her that he would not allow her to terminate the interrogation whenever she wanted and that it would be futile for her to seek to retract her prior waiver and reassert her constitutional right to cut off questioning and remain silent. *Id.* 433 A.2d at 361–62.

mining whether a statement is voluntary. *Id.* (quoting *State v. Smith,* 615 A.2d 1162, 1163 (Me.1992)). " 'A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair.' " *Id.*

In reviewing the totality of the circumstances, it appears that Marden signed a *Miranda* waiver sheet, participated actively in the interview, avoided direct answers to certain questions, and was alert. Thus, the trial court's finding beyond a reasonable doubt that Marden's statements were voluntary is not clearly erroneous. *See State v. Curtis,* 552 A.2d 530, 532 (Me.1988) (despite defendant's isolated emotional outburst during the interview his statements were voluntary when he participated actively in the interview, asked questions, and avoided direct answers to certain questions).

### III. *Opinion Testimony*

■ Without objection a detective testified that he knew that the source of smoke he smelled on the sleeve of Marden's jacket was not cigarette smoke because he was a non-smoker and therefore had a keen sense to cigarette smoke, and also because as a firefighter he was aware of the odor of smoke from burning wood. Marden contends that the detective's opinion was inadmissible because it did not satisfy the requirements for expert testimony.

■ Because Marden failed to object to the challenged testimony at the trial, we review for obvious error affecting substantial rights. *State v. Sargent,* 656 A.2d 1196, 1199 (Me.1995); M.R.Crim.P. 52(b). "An obvious error is a 'seriously prejudicial error tending to produce manifest injustice.' " *Id.* (citations omitted). We will vacate a trial court's judgment based on an error not brought to the court's attention only when the error complained of is so highly prejudicial and so taints the proceedings as to virtually deprive

the defendant of a fair trial. *State v. Williams,* 653 A.2d 902, 908 (1995) (citing *State v. True,* 438 A.2d 460, 468 (Me.1981)).

■ Pursuant to M.R.Evid. 702, the subject matter of expert testimony must be beyond common knowledge, calling for "specialized knowledge" that would be helpful to the trier of fact, and the witness must be qualified to give the opinion sought.[5] There was no evidence regarding the reliability of the detective's method of differentiating between types of smoke or even that he was qualified to do so. Accordingly, his opinion about different types of smoke odors was inadmissible. The testimony, however, was not so highly prejudicial that it so tainted the proceeding that it virtually deprived Marden of a fair trial. The detective did not directly identify the odor on Marden's jacket and there was other incriminating evidence independent of the statement to sustain the jury's verdict. In addition, Marden's attorney initially inquired about the source of smoke and elicited the testimony that the detective did not believe the smell of smoke on Marden's jacket was from cigarettes. *See Sargent,* 656 A.2d at 1199 (no obvious error when there is ample evidence independent of challenged testimony and defendant not only failed to object, he cross-examined victim at great length regarding consent and made consent an issue).

### IV. *Sufficiency of Evidence*

■ Marden contends that the evidence is insufficient to prove that he set the fire. He argued that the testimony placed him at a friend's apartment until 8:40 p.m., therefore, he did not have enough time to set the fire.

■ When reviewing challenges to the sufficiency of the evidence, we review the evidence in the light most favorable to the State to determine whether a factfinder " 'rationally could find beyond a reasonable doubt every element of the offense charged.' " *State v. Taylor,* 661 A.2d 665, 668 (Me.1995) (quoting *State v. Barry,* 495 A.2d 825, 826

---

5. M.R.Evid. 701 permits opinion testimony by lay witnesses if it is based on a witness's perception and is helpful to understand the testimony or determination of a fact in issue. Although it may not be necessary for a witness to qualify as

an expert to identify the smell of cigarette smoke, opinion testimony that identifies different types of smoke on clothing is not within the common knowledge of an ordinary person and thus, may not be given by a lay witness.

(Me.1985)). A conviction may be based on circumstantial evidence. *State v. Boobar,* 637 A.2d 1162, 1172 (Me.1994) (citing *State v. Bowman,* 611 A.2d 560, 561 (Me.1992)). A factfinder is allowed to draw reasonable inferences from circumstantial evidence. *State v. Benner,* 654 A.2d 435, 437 (Me.1995). The weight to be given to the evidence and the determination of witness credibility are the exclusive province of the jury. *Id.* (quoting *State v. Glover,* 594 A.2d 1086, 1088 (Me. 1991)). Viewing the evidence in the light most favorable to the State the evidence was sufficient for the jury to rationally conclude that Marden set the fire.

### V. *Excessive Sentence*

■■■■■ Marden contends, and the State concedes, that the thirty year sentence was excessive. After the court imposed sentence in this case we held in *State v. Cloutier,* 646 A.2d 358, 361 n. 4 (Me.1994) (citing *State v. Hawkins,* 633 A.2d 78, 79 (Me.1993)), that the maximum period of incarceration cannot exceed twenty years unless a period in excess of twenty years can be justified as a basic period of incarceration. "Only if the offense is among 'the most heinous and violent crimes that are committed against a person,' is the maximum statutory sentence available for a Class A offense increased from twenty to forty years." *State v. Babbitt,* 658 A.2d 651, 653 (Me.1995) (citation omitted). " 'Circumstances of the offender, or other circumstances unrelated to the nature and seriousness of the offense, cannot elevate the *maximum* period of incarceration beyond the twenty years when the crime itself is not within the extended range of Class A crimes.' " [6] *Babbitt,* 658 A.2d at 653 (quoting *Hawkins,* 633 A.2d at 79). Here the manner of commission of the charged offense is not among the "the most heinous and violent crimes committed against a person." The sentencing court in the instant case properly determined that the basic sentence fell within the 18–20 year range. In considering the maximum period of incarceration

the court in considering the aggravating circumstances improperly increased Marden's sentence to 30 years. Accordingly, Marden's sentence of thirty years is excessive.

The entry is:

Judgment affirmed. Sentence vacated. Remanded for resentencing.

All concurring.

---

**6.** In 1995 the Legislature amended 17–A M.R.S.A. § 1252(2)(A) (Supp.1995) to provide, in pertinent part:

> The court may consider a serious criminal history of the defendant and impose a maximum period of incarceration in excess of 20 years based on either the nature and seriousness of the crime alone or on the nature and seriousness of the crime coupled with the serious criminal history of the defendant;