1997 ME 219

**STATE of Maine**

v.

**Robert KALER and James Farrar.**

Supreme Judicial Court of Maine.

Argued March 4, 1997.
Decided April 4, 1997.

---

**1228**

Geoffrey A. Rushlau, District Attorney (orally), Wiscasset, for State.

Mark L. Randall (orally), Mary A. Davis, Danile G. Lilley Law Offices, P.A., Portland, for Robert Kaler.

Edward G. Dardis (orally), Howard & Bowie, Damariscotta, for James Farrar.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

WATHEN, Chief Justice.

[¶ 1] Defendants, James Farrar and Robert Kaler were convicted by jury verdicts in a joint trial held in the Superior Court (Lincoln County, *Bradford J.*). Farrar appeals from his conviction as an accomplice to aggravated assault pursuant to 17–A M.R.S.A. § 57(3)(A)[1] and 17–A M.R.S.A. § 208 (1983).[2] Kaler appeals from his conviction of aggravated assault pursuant to 17–A M.R.S.A. § 208 (1983) and reckless conduct with a firearm pursuant to 17–A M.R.S.A. § 211 (1983).[3] Defendant Farrar argues that the evidence was insufficient to sustain his conviction as an accomplice. Both defendants argue that the court erred in failing to grant their joint motion for a new trial. They contend that a jury officer's statement to a juror, directing her to return to the jury room during deliberations, constituted an extraneous influence or an irregularity in deliberations that justifies a new trial. We disagree, and affirm the judgments.

[¶ 2] The evidence presented at trial may be summarized as follows: On Sunday, January 29, 1995, defendant Farrar was at home watching the Superbowl on television along with his girlfriend, Tory Jolicoeur; his employer, defendant Kaler; and three other friends. They heard a noise like a loud

---

1. A person is an accomplice of another person in the commission of a crime if:
   A. With the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempt to aid such other person in planning or committing the crime.
   17–A M.R.S.A. § 57(3)(A) (1983).

2. A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly causes:
   A. Serious bodily injury to another; or
   B. Bodily injury to another with use of a dangerous weapon; or....
   17–A M.R.S.A. § 208 (1983).

3. A person is guilty of reckless conduct if he recklessly creates a substantial risk of serious bodily injury to another person.

   17–A M.R.S.A. § 211 (1983).

"pop" in the driveway. Kaler went out to investigate and discovered that the tires on Farrar's pickup truck were slashed. Kaler and Farrar concluded that the tires had been slashed by members of a local family of fishermen with whom they had an ongoing feud. The tires on a boat trailer belonging to Kaler's father and on a truck belonging to Farrar had been slashed a couple weeks before this incident. Defendants had also been receiving threatening phone calls. Although they had been unable to positively identify the perpetrators, defendants believed that the fishermen were behind these incidents. On this occasion, Farrar took a 20 gauge semi-automatic shotgun from the house and handed it to Kaler. Thus armed, they drove off in a black Chevrolet Celebrity in pursuit of the perpetrators, with Farrar behind the wheel.

[¶ 3] In fact, the perpetrator was Tory Jolicouer's former boyfriend, Matthew Doughty, not the feuding fishermen. Doughty had been driven to Farrar's home by a friend, Gabriel Shadis, in a blue Volvo belonging to Shadis. Shadis had no foreknowledge of Doughty's plans. When Shadis realized that defendants were in pursuit, he attempted to elude them. He drove about 120 feet down a side road, turned off his lights and parked facing the main road. Kaler and Farrar noticed the headlights just as they were turned off. Farrar drove into the side road at a fast rate of speed, stopping in front of the Volvo. Shadis drove off scraping the edge of the Celebrity's door as Kaler was getting out. Kaler fired several shots at the Volvo, hitting Shadis in the neck with one of the shots. Shadis drove to the hospital with defendants in pursuit until they neared the hospital.

[¶ 4] The complainants, Shadis and Doughty, provided inconsistent testimony about the placement of the vehicles on the side road. They testified that the vehicles did not collide, although they admitted to the possibility of it. They also testified that Shadis was hit as they neared the entrance to the main road, and that at some later point in the chase they heard another shot. Defendant Kaler testified that Shadis tried to run him over, that he jumped behind the open car door to avoid being hit, and that he believed the Volvo was backing up to hit him when he fired several shots in self-defense. He testified that he fired all the shots when the Volvo was only ten to fifteen feet away, contrary to the complainants' testimony that the Volvo was speeding away during the shooting.

[¶ 5] The investigating officer recovered a 20 gauge shotgun from a bedroom in the Farrar house the next day. It was loaded with buckshot: one round in the chamber and three in the magazine. Five empty 20 gauge shotgun shells, four slugs and one buckshot, were found along the edge of the side road. A ballistics expert determined that all five were fired from the shotgun found at the Farrar house. No spent shells were ever found on the main road. The expert could not tell if the Volvo was stationary when hit. He found damage on the trunk and rear window consistent with buckshot that was fired from six to ten feet away. Other damage was consistent with slug holes. He acknowledged that these slugs could have been fired from a greater distance. Forensic evidence demonstrated conclusively that the Volvo had scraped the edge of the Celebrity door as the vehicles passed.

[¶ 6] The jury found Kaler guilty of aggravated assault and reckless conduct with a firearm. Farrar was found guilty as an accomplice to aggravated assault.

## I.

[¶ 7] Farrar argues that the evidence is insufficient to establish accomplice liability, and that his conviction was improperly based on his mere presence at the scene of the shooting. Although mere presence is not sufficient to establish accomplice liability, once presence is proven, "the State need prove only any conduct promoting or facilitating, however, slightly, the commission of the crime." *State v. Libby*, 435 A.2d 1075, 1077 (Me.1981). On a sufficiency of the evidence challenge we review the evidence in the light most favorable to the State to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense charged. *State v. Marden*, 673 A.2d 1304, 1311 (Me.1996).

[¶ 8] Farrar argues that the forensic and physical evidence required the jury to reject the complainants' version of the incident. First, he argues that the complainants' testimony pertaining to the placement of the vehicles on the side road, was mutually inconsistent and inconsistent with the forensic and physical evidence. Contrary to Farrar's contention, these inconsistencies do not render the complainants' version of the events wholly incredible. The jury could conclude that Shadis and Doughty were merely confused on these points without rejecting their testimony altogether. Unless testimony is "inherently improbable and incredible and does not meet the test of common sense," it is the jury's function to resolve inconsistencies and determine the credibility of witnesses. *State v. McFarland,* 369 A.2d 227, 229 (Me.1977).

[¶ 9] Farrar also argues that the physical and forensic evidence prove incontrovertibly that the Volvo was stationary when shot at from a distance of six to ten feet. He argues that this evidence renders incredible the complainants' version that they were speeding away when the shots were fired. Farrar's argument relies ineffectively on the inconclusive ballistics evidence. The ballistics expert testified that his conclusions about the pattern of shots was not certain, and that he could not tell if the Volvo was stationary when hit. His conclusion that the gun was fired from six to ten feet away was limited to the one buckshot firing, and he acknowledged that the three or four slugs could have been fired from a much greater distance. This testimony would not preclude a jury from rationally finding that Kaler fired the buckshot when the Volvo was ten feet away, and that he kept firing the slugs as Shadis sped away, finally hitting Shadis with a slug as he approached the main road. The determinations of witness credibility and the weight to be given the evidence are within the exclusive province of the jury. *State v. Marden,* 673 A.2d at 1312. Moreover, the jury may draw reasonable inferences from proven facts. *Id.*

[¶ 10] The evidence in the record is sufficient to support the following findings. Kaler and Farrar shared a motive to seek revenge against the occupants of the Volvo, who they believed were the perpetrators of a series of tire slashings and other harassments. Shadis was at all times attempting to hide or get away from defendants and had no motive to attempt to run Kaler down. Farrar provided the loaded and cocked shotgun that Kaler used to fire several shots at the complainants. As Kaler opened the Celebrity's front passenger door to get out, Shadis drove by scraping the front edge of the door. As Shadis drove off, Kaler fired several shots at the back of the Volvo, the last shot hitting Shadis in the neck as he neared the main road. Farrar continued to pursue the complainants after Kaler fired a full round of shots. The jury could also have concluded that the gun was reloaded and another shot was fired during the subsequent pursuit. Based on the direct and circumstantial evidence, viewed in the light most favorable to the State, the jury could have rationally found beyond a reasonable doubt that Farrar intentionally promoted or facilitated the commission of the crime of aggravated assault.

[¶ 11] Farrar makes a further argument, that he cannot be found liable as an accomplice for Kaler's shooting because Kaler was acting out of self-defense, responding, either reasonably or unreasonably, to a perceived threat. This argument is without merit because the jury rationally could have rejected Kaler's self-defense testimony. "[M]erely because there is evidence sufficient to generate an issue [of self-defense] does not mean the jury is compelled to believe that evidence." *State v. Lagasse,* 410 A.2d 537, 542 (Me.1980).

## II.

[¶ 12] The court denied defendants' motion for a new trial alleging an irregularity in jury deliberations. The following facts were presented at a hearing on the motion. During deliberations, one of the jurors walked out of the jury room with her coat on. She was confronted halfway down the hall by the jury officer who recalled the following interchange:

I said where are you going? She indicated she was disgusted with the process and was leaving. I said, no, you can't. You

have to go back. She said that if I go back to the effect (sic) I'll stay in the bathroom. I said I don't care where you stay, but you will have to go back to the jury room now. She turned and went back. And as I heard the door open I heard laughter and I heard somebody say I told you so. That was about it. Then I came up and then told you (the presiding judge).

In response to questions by the prosecutor, the officer stated that the juror had been out of the jury room for about 30 seconds and that the jury came back with a verdict about a half hour later. At the hearing, the juror gave the following account of the incident:

I said something to the effect they are not listening to me. I don't want to deal with it. I want to go home. He said I couldn't. So I went back in the room.... I said I was just going to hide in the bathroom because there was only the bathroom. I was going to hide. I felt I was being hassled a bit. I didn't know what to do.

She also stated that she was out of the room for only "seconds," and that it was "quite awhile" after the incident that they reached a verdict.

■■■ Defendants present three arguments in support of their motion for a new trial; one is raised for the first time on appeal. First, defendants argue that the jury officer's statement to the juror directing her to return to the jury room constituted "extraneous, potentially prejudicial information". Juror exposure to extraneous information raises a presumption of prejudice "and the burden of proof shifts to the State which must demonstrate by clear and convincing evidence that the information did not prejudice the case." *State v. Royal,* 590 A.2d 523, 525 (Me.1990). We have defined "extraneous" to mean "information introduced to the jury from outside the normal deliberative process." *Marr v. Shores,* 495 A.2d 1202, 1205 (Me.1985). *E.g., State v. Fuller,* 660 A.2d 915, 918 (Me.1994) (juror note-taking did not introduce "extraneous" information.) To raise a presumption of prejudice, however, the "information" received must also relate to the law or facts of the case.

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial *about the matter pending* before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (emphasis added). Because the jury officer's statement did not reveal any information "about the matter pending before the jury," it did not constitute the type of extraneous information that will give rise to a presumption of prejudice.

■■■ [¶ 13] The jury officer's statement also did not constitute an extraneous influence. The officer's statement to the juror was "made in pursuance of known rules of the court," *Id.* As a matter of practice and tradition, the officer was performing his sworn duty to keep the jury together during deliberations. Therefore, the statement was not "introduced to the jury from outside the normal deliberative process," and did not constitute an "extraneous" influence. *Fuller,* 660 A.2d at 915.

■■■ [¶ 14] Next, defendants argue that the officer's statement constituted a jury instruction that had the coercive effect of a "dynamite charge" or "Allen charge." In *State v. White,* 285 A.2d 832, 838 (Me.1972), we rejected the use of the "*Allen* charge,"[4] a jury instruction to a potentially deadlocked jury that emphasizes the duty to return a verdict. We adopted the ABA standard jury charge that provides the crucial balance between the desirability of reaching a verdict and the desirability of ensuring that the verdict accurately reflects the honestly held beliefs of individual jurors. A charge to a potentially deadlocked jury that does not embody this crucial balance "is unacceptably coercive." *State v. Weidul,* 628 A.2d 135, 137 (Me.1993).

■■■ [¶ 15] The officer's statement was not an "instruction" to the jury and did not have a coercive effect "akin to an *Allen*

4. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

charge". The statement did not, directly or indirectly, convey the message that the jury must reach a decision. Nor did it emphasize, in any way, the "importance of agreement to the exclusion of the dictates of conscience." *United States ex rel. Tobe v. Bensinger*, 492 F.2d 232, 239 (7th Cir.1974) (statement by court officer to jury that they must reach a decision was "akin to an '*Allen* charge'"). The communication was a simple directive to remain in the jury room during deliberations.

 [¶ 16] Defendants have expanded their "*Allen* charge" argument on appeal to contend that the court, when informed of the incident, was "constructively notified" of a disagreement revealing that the jury was deadlocked. They argue that the court was then obliged to give a jury instruction in accordance with the standards adopted in *White*. The ABA standards recommend the instruction when "it appears to the court that the jury has been unable to agree." ABA Standards for Criminal Justice § 15–4.4(b) (1980), *see Weidul*, 628 A.2d at 136. The court was not obligated to assume that the jury was unable to agree simply because one juror expressed frustration with the deliberative process. Subsequent events confirmed that the jury was, in fact, not deadlocked. The frustrated juror returned to the jury room and "quite a while" later the jury rendered a unanimous verdict.

[¶ 17] Finally, defendants argue that the court erred by failing to notify them of the officer's statement to the juror at the time it was made. "A defendant has an absolute right to hear everything the jury hears." *White*, 285 A.2d at 835. This argument is raised for the first time on appeal. When defendant fails to object or otherwise preserve an error for appellate review, we review for obvious error pursuant to M.R.Crim.P. 52(b). *See State v. Franklin*, 478 A.2d 1107, 1110 (Me.1984) (new ground of objection advanced on appeal); *State v. Pelletier*, 673 A.2d 1327, 1330 (Me.1996) (failure to object at trial). Error is obvious only when it is so highly prejudicial and so taints the proceedings as virtually to deprive the defendant of a fair trial. *Id.*

[¶ 18] The record does not compel a finding of serious prejudicial error. There has been no showing of prejudice resulting from the officer's statement itself. The jury poll, taken pursuant to M.R.Crim.P. 31, revealed a unanimous verdict. Three months after the trial, the court held an evidentiary hearing on defendants' motion and interviewed the jury officer and the juror. Neither the officer nor the juror expressed any difficulty in remembering the details of their conversation. Although the court erred in failing to immediately inform the parties of the incident in question, defendants have not demonstrated that the error so tainted the proceedings as to virtually deprive them of a fair trial.

The entry is:

Judgments affirmed.

