5 P.2d 478

**STATE of Idaho, Plaintiff–Respondent,**

v.

**John WHIPPLE, Defendant–Appellant.**

No. 24741.

Court of Appeals of Idaho.

June 19, 2000.

Val Siegel, Kingston, for appellant.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

SCHWARTZMAN, Judge.

John Whipple appeals from his judgment of conviction for second degree murder and unified sentence of life imprisonment, with fifty years fixed. Whipple argues that the trial court erred in denying his motion to suppress his statement to the police; permitting rebuttal testimony about prior violent acts; not giving an involuntary manslaughter jury instruction; not ordering a further psychological evaluation for use at sentencing; and in imposing a life sentence with fifty years fixed. We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 1996, Whipple bludgeoned his wife, Deborah Kay Whipple, to death. Whipple's children found their mother in the trunk of the family car and notified the police. About an hour later Whipple walked into the Shoshone County Sheriff's Office alone and asked to speak to Lieutenant Spike Angle. Angle had been investigating the death of Deborah Kay and was called back to the office to talk with Whipple. Although Whipple's appearance at the Sheriff's office was voluntary and he was not in custody, as a precaution Whipple was *mirandized*.[1] Whipple then agreed to an interview with Angle, which Angle audiotaped. After describing his history of marital problems, Whipple became extremely emotional. During questioning about the death of his wife, Whipple repeatedly said, "No more." After being encouraged to continue, Whipple ad-

mitted to killing Deborah Kay with an autobody hammer. The interview lasted no more than an hour and an half. Whipple was charged with the first degree murder of his wife.

Whipple filed a motion to suppress his alleged confession. Following a hearing and a review of the audiotape of the interview with Angle, the district court ruled that Whipple's "no more" statements were not equivalent to an invocation of the right to remain silent and denied Whipple's motion to suppress.

Whipple filed a motion for appointment of a psychological expert to evaluate his mental condition and his capacity to form specific criminal intent, which the district court granted. Whipple gave notice of intent to claim a *mens rea* defense and intent to call psychologists Dr. Michael Urban, Ph.D. and Dr. Walter Knake, Ph.D. as expert witnesses for the defense. The state had mental exams conducted on Whipple by psychologist Dr. Daniel Hayes and psychiatrist Dr. William Miller.

At trial, the pathologist testified that Deborah Kay was killed by blunt impact injury, typical of a hammer blow. The pathologist identified at least four separate blows to the skull and that the cause of death was tears and bruising to the brain caused by the blunt impact injury. A criminalist testified that the blood on Whipple's hammer was type A, the same as Deborah Kay's blood type. Three of Whipple's children testified to the events the morning of Deborah Kay's murder. The state offered their testimony to prove Whipple's response to stress, and all three testified about Whipple's past anger, threats and abuse of family members.

In defense, Whipple testified about his violent childhood, military training and bad experiences in Vietnam, family stresses and the breaking up of his relationship with Deborah Kay. Whipple said that after his return from his tour of duty in Vietnam, he would become angry with Deborah Kay, have Vietnam flashbacks and go into a tunnel-like rage in which he would not know what he was doing.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Whipple testified that on the morning he killed Deborah Kay, he was following her down the steps to the garage with the intent of walking with her downtown to get the mail when she turned around and told him, "Pack your bags and get out!" Whipple testified that he felt she was sneering at him, that he was filled with jealous thoughts about her having a boyfriend and that he went into a blind rage as he reached for Deborah Kay's shoulders. The next thing he could recall was seeing Deborah Kay's bloodied body lying on the garage floor. After she died, he placed her in the trunk of the car, cleaned up some of the blood, and left after briefly seeing his children.

Dr. Knake, Whipple's treating psychologist during a hospitalization following a suicide attempt in the 1980's, testified that Whipple suffered from post-traumatic stress disorder (PTSD), dissociative disorder of the amnesic type, and intermittent explosive disorder. Dr. Knake further testified that Whipple's blind rage and violence were triggered by Deborah Kay sneering at him and telling him to "pack your bags and get out." On cross-examination, Dr. Knake admitted that PTSD and intermittent explosive disorder are not excuses for Whipple's conduct, that Whipple had intermittent memories of hitting Deborah Kay with the hammer, and that Whipple was not out of touch with reality.

Dr. Urban agreed with Dr. Knake's diagnosis. Dr. Urban testified that his testing indicated Whipple was extremely angry most of the time and that there was no evidence of malingering. Dr. Urban indicated that persons in the throes of PTSD are unable to premeditate.

On rebuttal, Dr. Hayes testified that Whipple had intermittent explosive disorder and mixed personality disorders–ingrained patterns of behavior, but he did not have PTSD. On cross-examination, Dr. Hayes testified that persons with intermittent explosive disorder are generally capable of premeditation.

Also in rebuttal, the state called Joseph Peak, a member of the local school board, to testify that Whipple had threatened to kill him and a bus load of school children several years earlier; and Michelle Whipple, Whipple's oldest daughter, to testify about his abuse of her, other family members, her possessions and pets. The testimony was intended to illustrate Whipple's ability to premeditate and inflict violence upon others. Whipple objected that their testimony was irrelevant and prohibited under I.R.E. 404(b) and 403. The district court ruled that the testimony of Peak and Michelle Whipple was relevant to Whipple's ability to premeditate. Thereafter, Peak testified to an incident in which Whipple had threatened to shoot at a school bus and its occupants. Michelle Whipple testified that, as a child in the 1980's, Whipple had intentionally killed her pets, thrown food in her face, taunted her, threatened to kill her, beat her severely, destroyed her possessions, smashed the family car with a sledge hammer and threw her infant sister against a wall.

Finally, Dr. Miller, a psychiatrist, testified that he diagnosed Whipple as only having personality disorders, not PTSD or intermittent explosive disorder. Dr. Miller testified that Whipple's reaction to his wife telling him to pack up and leave was consistent with domestic violence learned from his upbringing.

The jury found Whipple guilty of the lesser included offense of murder in the second degree. Prior to sentencing, counsel for Whipple filed a motion for appointment of Dr. Urban, pursuant to I.C. § 19–2522, for a psychological examination prior to sentencing. The district court denied the motion, ruling that such a report was unnecessary in light of Dr. Urban's, Dr. Knake's and Dr. Miller's testimony at trial. At sentencing, the district court imposed a life sentence, with fifty years fixed. Whipple's motion for reduction of sentence was denied following a hearing. Whipple appeals.

## II.

**WHETHER WHIPPLE'S "NO MORE" STATEMENT REQUIRED A TERMINATION OF HIS INTERVIEW OR A CLARIFICATION OF WHETHER HE WISHED TO INVOKE HIS RIGHT TO REMAIN SILENT**

### A. Standard of Review

The standard of review of a suppression motion is bifurcated. When a decision

502

on a motion to suppress is challenged, we accept the trial court's findings of fact that were supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson,* 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App.1996).

## B. Discussion

Whipple argues that his repeated cries of "No more" in the face of Angle's questioning was an unambiguous invocation of his Fifth Amendment right to terminate custodial interrogation, which Angle violated by continuing the questioning. Alternatively, he argues that his statements of "no more" must be deemed an equivocal invocation of the right to remain silent, and that continued questioning had to be limited to determining whether he in fact wanted to invoke his right to remain silent.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a suspect can assert his right to silence or right to counsel at any time, even after an initial waiver of those rights. 384 U.S. at 444–45, 86 S.Ct. at 1612–13, 16 L.Ed.2d at 706–07. Upon unambiguous invocation of the right to counsel or to remain silent, all questioning must cease. A number of federal and state courts extended this rule to equivocal invocations of the right to counsel or the right to remain silent. *See, e.g., Martin v. Wainwright,* 770 F.2d 918, 924 (11th Cir.1985) and *State v. Moulds,* 105 Idaho 880, 889, 673 P.2d 1074, 1083 (Ct.App. 1983) (holding that under the Fifth Amendment an equivocal invocation of the right to counsel—"Maybe I need an attorney"— requires that questioning cease for specific inquiry into whether the defendant in fact wants an attorney present). The Supreme Court's decision in *Davis v. United States,* 512 U.S. 452, 460–61, 114 S.Ct. 2350, 2355–56, 129 L.Ed.2d 362, 372–73 (1994), however, clearly rejected such lower federal and state court interpretations of the Fifth Amendment, eliminating the duty of police officers to clarify a suspect's intent upon an equivocal invocation of counsel. The *Davis* Court explained that an objective standard applies to a suspect's statement invoking the right to

counsel. 512 U.S. at 459–61, 114 S.Ct. at 2355–56, 129 L.Ed.2d at 371–73. The suspect's statement must be clearly understandable as an assertion of the right to counsel before questioning must cease. *Id.* This has since been dubbed the "clear articulation rule." *People v. Arroya,* 988 P.2d 1124, 1131 (Colo.1999).

In *Coleman v. Singletary,* 30 F.3d 1420, 1424 (11th Cir.1994), the Court of Appeals held that *Davis,* by extension, had eliminated the requirement that officers cease questioning and clarify a suspect's intent upon an equivocal invocation of the right to remain silent. Applying the reasoning in *Coleman,* the Minnesota Supreme Court held a suspect's hostile reaction to police questioning is not sufficient, standing alone, to invoke that suspect's Fifth Amendment right to silence. *State v. Williams,* 535 N.W.2d 277 (Minn. 1995). In *Williams,* the suspect became angry during interrogation, said, "I don't have to take any more of your bull——," and left the interview room. After a brief cooling off period, the officers continued the interrogation in the suspect's detention cell. The suspect made incriminating statements. The trial court denied the defendant's motion to suppress. The Minnesota Supreme Court affirmed, explaining:

> Conceivably, many criminal suspects act in a hostile manner towards their interrogators. Thus, a rule allowing a suspect's hostility to be sufficient to unambiguously invoke the right to remain silent would unreasonably impede law enforcement efforts. The suspect's hostile behavior would impose a barrier to police questioning in numerous cases. That approach fails to strike an appropriate balance between the state's interest in obtaining confessions from criminals and the suspect's interest in not being compelled to incriminate himself. We decline to adopt such an approach. Thus, to unambiguously invoke the right to remain silent, we conclude that a suspect's hostile behavior, standing alone, is ordinarily insufficient, and we conclude that the language used by the suspect must sufficiently articulate the desire to remain silent. To hold otherwise would encourage judicial second-guessing of po-

lice officers as to the meaning of a suspect's actions.

535 N.W.2d at 283. Applying this reasoning in *Arroya*, 988 P.2d at 1132, the Supreme Court of Colorado held that a trial court was required to consider a wide range of factors in determining whether a suspect's statement was a clear invocation of the right to remain silent. These factors include the plain meaning of the suspect's words, the officer's response to those words, the suspect's speech patterns, content of the interrogation, demeanor and tone of the interrogating officer, the suspect's conduct during questioning, the point at which the suspect invoked the right to remain silent, the questions which drew the invocation, the officer's response and who was present during questioning. *Id.*

In the case at hand, Whipple, without a police request to do so, voluntarily appeared at the Sheriff's office and specifically requested to talk with Angle. Whipple was not under arrest and the *Miranda* warning given was merely precautionary. *See State v. Kuzmichev*, 132 Idaho 536, 543, 976 P.2d 462, 469 (1999). After being *mirandized*, Whipple insisted upon speaking to Angle. For nearly an hour, Whipple rambled on about the circumstances of his troubled relationship with Deborah Kay. After describing leaving the house that morning with his wife, Whipple said that Deborah Kay denied his request to walk with her, telling him that he irritated her and that she wanted him to leave, to get out. Angle asked Whipple what happened at the bottom of the stairs and Whipple became extremely emotional. Angle encouraged Whipple to calm himself down, sit in his chair and continue telling his story. When asked what happened at the bottom of the stairs, Whipple, overcome by emotion, said: "I don't wanta say man ... I don't wanta say that, I don't want to." After more rambling about how it was not Deborah Kay's fault and asking "Why's she do it to me, why did she do it, Why," Whipple exclaimed "NO MORE, NO MORE." Angle asked, "No more what?" and Whipple said that he became angry when Deborah Kay asked him to leave. When asked what happened after he got mad, Whipple said, "I hit her ... [with] a hammer, I believe."

Counsel for Whipple moved to suppress Whipple's post-"No more" statements. After considering the transcript of the interview, the testimony of Angle and listening to the tapes of the interview, the trial court denied Whipple's motion to suppress. The court found that Whipple requested to talk with Angle and was extremely emotional. The interview began with a *Miranda* warning. Whipple then indicated that he wanted to speak to Angle without an attorney present. The court explained that:

> Having listened to the tape [of Whipple's interview with Angle], as well as having read the transcript, the Court is abundantly satisfied that defendant was not invoking or attempting to invoke any right to silence by his referenced statement. His words clearly appear to be, as the State argued, an expression of disbelief in the events of the day, of an unwillingness, albeit passing, to confront reality. Further, it is inconsistent that defendant would present himself to the Sheriff's Office, request an audience with an officer, ramble for an hour, and then say he did not want to talk to anybody. This was not a situation where an unwilling suspect was arrested by police and then, after succumbing to interrogational pressures and responding to initial questions, finally realizes that further talking to the police is not in his best interest and says so. The context of what defendant's counsel argued were equivocal invocations of the right to terminate questioning shows them not to be so.

In conclusion, defendant presented himself to the Sheriff's Office and requested an audience with Officer Angle. When Angle arrived, defendant again confirmed that he wanted to talk to him. When the formal interview began, preserved by tape recording, defendant again expressed his willingness to talk to the officers. The defendant was given full advice of rights, and he expressed his understanding of them and his willingness to nevertheless proceed to talk with the police. The tone and tenor of the interview do not display, or even intimate, intimidating or other coercive words or practices of the officers. The Court finds defendant's statements to be informed, voluntary, and uttered after a clear expression of his desire to speak with

the police full knowing that he had both the right to silence and the right to the presence of counsel. The motion to suppress is denied.

There is substantial, competent evidence to support the trial court's findings, based upon the totality of the circumstances described above. It is also clear that Whipple was intensely emotional, having bludgeoned his wife to death an hour earlier. From the trial court's review of the audiotape—reflecting Angle's demeanor, his questions and tone, and his responses to Whipple's conduct at the point at which Whipple said, "No more"— Whipple was not making a clear and unequivocal invocation of his right to remain silent. Rather, the court concluded that Whipple's "no more" statement was not even an equivocal invocation of his right to terminate his interview with Angle.

The trial court did not specifically apply the objective test—how a reasonable police officer under the circumstances would view Whipple's "no more" statement. However, we conclude that an objective view of the facts would lead a reasonable police officer to conclude that Whipple was merely having a difficult catharsis, i.e., needing to express himself, but not having an easy time coming to grips with the reality that he had bludgeoned his wife to death with a hammer.

We therefore hold, under the facts of this case, that Angle was not required to terminate questioning or seek a clarification of whether Whipple did in fact wish to invoke his right to remain silent when Whipple began to say "no more" in response to Angle's questions. Accordingly, we affirm the trial court's denial of Whipple's motion to suppress.

## III.

## THE PROPRIETY OF THE DISTRICT COURT'S RULING TO ADMIT THE REBUTTAL TESTIMONY OF PROSECUTION WITNESSES MICHELLE WHIPPLE AND JOSEPH PEAK REGARDING PAST INTENTIONAL VIOLENCE BY WHIPPLE

### A. Standard of Review

■■■ To determine the admissibility of this evidence, essentially prior uncharged bad acts, the trial court was required to engage in a two-tiered analysis, first inquiring whether under I.R.E. 404(b) the evidence is relevant to an issue other than character or propensity, and second whether under I.R.E. 403 the probative value of that evidence is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Tapia,* 127 Idaho 249, 254, 899 P.2d 959, 964 (1995); *State v. Canelo,* 129 Idaho 386, 393, 924 P.2d 1230, 1237 (Ct.App.1996). This Court exercises free review over a trial court's determination of the testimony's relevance because relevancy is neither a factual issue nor a matter of judicial discretion. *See State v. Raudebaugh,* 124 Idaho 758, 764, 864 P.2d 596, 602 (1993); *State v. Atkinson,* 124 Idaho 816, 819, 864 P.2d 654, 657 (Ct.App. 1993). The determination of whether the risk of unfair prejudice substantially outweighs the probative value of the evidence is within the discretion of the trial court. *State v. Porter,* 130 Idaho 772, 784, 948 P.2d 127, 139 (1997); *State v. Olsen,* 103 Idaho 278, 282, 647 P.2d 734, 738 (1982). On appeal we apply a three-tiered abuse of discretion standard, inquiring into whether the district court (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) reached its decision by an exercise of reason. *State v. Matthews,* 124 Idaho 806, 809, 864 P.2d 644, 647 (Ct.App.1993).

### B. Discussion

■■■ To rebut expert psychological testimony regarding Whipple's inability to premeditate the instant offense due to PTSD with attendant dissociative episodes and intermittent explosive disorder, the state called Joseph Peak and Michelle Whipple. The state sought to admit the testimony of Peak to show Whipple's ability to deliberate or premeditate generally, in that Whipple was upset with events at the elementary school his children attended and he threatened to kill Peak, the school superintendent. Likewise, the state sought to admit Michelle Whipple's testimony about his abuse to show

Whipple's ability to act deliberately and violently against his family. Whipple's objections under I.R.E. 403 and 404 were rejected.

Whipple argues that he was prejudiced by this testimony because Whipple's violence was unintentional only in moments of extreme stress in which he responded in a "life or death" manner. The state argues that the evidence in question directly rebutted Whipple's defense of a long history of non-volitional violence due to mental illness in the 1980's and defense expert testimony.

█ Idaho Rule of Evidence 404(b) prohibits the admission of evidence of other crimes or wrongs for the purpose of showing a person's character or propensity to commit crimes. *State v. Vierra*, 125 Idaho 465, 471, 872 P.2d 728, 734 (Ct.App.1994); *State v. Guinn*, 114 Idaho 30, 34, 752 P.2d 632, 636 (Ct.App.1988). In light of Whipple's defense and the evidence marshalled to raise that defense—that at the time he killed his wife he did not premeditate killing her and merely acted in a rage attributable to PTSD with attendant dissociative disorder and intermittent explosive disorder, evidence of Whipple's ability to deliberately cause injury to his family was proper rebuttal. The prior acts evidence was relevant to show his capacity to premeditate, while the evidence of Whipple's apparently conscious abuse of Michelle Whipple fifteen years before was relevant to show that his prior conduct had been volitional.

A theory that premeditated or conscious acts in the past make the fact of premeditation or conscious acting in this case more likely than such would be without that evidence treads dangerously close to propensity evidence prohibited by I.R.E. 404(b). However, that line was not crossed in this case because the purpose of the testimony was *rebuttal* to Whipple's non-volition defense, not propensity. Furthermore, Whipple's defense—that he had a long history of mental

problems and that the killing of Deborah Kay occurred in a blind rage or blackout state—set the standard by which the testimony of Peak and Michelle Whipple was to be judged. We conclude that the trial court did not abuse its discretion in admitting this evidence under I.R.E. 403.

## IV.

### WHETHER THE DISTRICT COURT ERRED WHEN IT REFUSED WHIPPLE'S REQUEST FOR AN INVOLUNTARY MANSLAUGHTER JURY INSTRUCTION

█ The jury was instructed on first degree murder, second degree murder and voluntary manslaughter. The jury found Whipple guilty of second degree murder. Under the acquittal first instruction the jury was given, the jury had to acquit Whipple of all greater offenses before considering a lesser included offense. I.C. § 19–2132(c). Thus, having found Whipple guilty of second degree murder, the jury would have been precluded from considering a lesser included offense instruction on involuntary manslaughter. *See* I.C. § 19–2132(c); *State v. Trejo*, 132 Idaho 872, 879, 979 P.2d 1230, 1237 (Ct.App.1999) (Where the record demonstrates that the district court did instruct the jury on aggravated battery and a lesser included offense and gave the jury an "acquittal first" instruction, the jury's verdict of guilty of aggravated battery foreclosed consideration of any lesser included offenses. The result, therefore, could not have been different even if the additional lesser included offense instructions had been given.). Accordingly, Whipple has failed to demonstrate that he was prejudiced by the trial court's denial of his request for an involuntary manslaughter instruction.[2] *State v. Miller*, 131 Idaho 288, 293–94, 955 P.2d 603, 608–09 (Ct. App.1997).

---

2. Additionally, we note that the focus of the defense was on Whipple's mental illness and whether his conduct in this instance was volitional, not whether a death occurred "in the perpetration of … any unlawful act [other than mayhem, etc.]; … or in the commission of a lawful act which might produce death, in an unlawful manner … [through negligence] or in the operation of any firearm or deadly weapon in a reckless, careless or negligent manner which produces death." I.C. § 18–4006(2). *See also State v. Arrasmith*, 132 Idaho 33, 44, 966 P.2d 33, 44 (Ct.App.1998) (no error in refusing to instruct on voluntary manslaughter because evidence presented did not support defense theory that the shooting was a father's reaction to the sexual abuse of his young daughter by the victim).

## V.

### WHETHER THE DISTRICT COURT ERRED IN DENYING WHIPPLE'S MOTION TO APPOINT DR. URBAN TO CONDUCT A PSYCHOLOGICAL EVALUATION PURSUANT I.C. §§ 19–2522 AND 19–2523

■ Idaho Code §§ 19–2522 provides that a psychological evaluation and report is mandatory "if there is reason to believe the mental condition of the defendant will be a significant factor at sentencing and for good cause shown." *See State v. McFarland*, 125 Idaho 876, 880, 876 P.2d 158, 162 (Ct.App. 1994). In such cases, I.C. §§ 19–2522 and 19–2523 set forth the procedures to be followed and factors to be considered by the district court at sentencing. The purpose of the psychological report outlined in I.C. § 19–2522 is to assist the district court at sentencing in determining whether to recommend psychological treatment under I.C. § 19–2523 during a defendant's confinement or probation. *State v. Harper*, 129 Idaho 86, 91, 922 P.2d 383, 388 (1996). The district court's refusal to order a psychological evaluation under I.C. §§ 19–2522 and 19–2523 will be upheld if the record supports a finding that either there was no reason to believe the defendant's mental condition would be a 'significant factor at sentencing' or that the information already before the court includes the factors listed in I.C. §§ 19–2522 and 19–2523. *McFarland*, 125 Idaho at 879–80, 876 P.2d at 161–62.

■ Whipple argues that the district court erred in denying his motion for psychological examination for use at sentencing. After reviewing the trial testimony of three psychologists and one psychiatrist, the district court concluded that information relevant to the factors set forth in I.C. §§ 19–2522 and 19–2523 were already present in the record, or could be inferred therefrom, and therefore the motion was denied. From

our review of the record, information pertinent to the extent of Whipple's mental illness, his level of impairment, his prognosis, the availability of treatment, the degree to which he presents a danger to the public and his capacity to appreciate the wrongfulness of his conduct were already in the record from trial testimony. Expert testimony also indicated that Whipple's personality disorders would improve as a function of aging, rather than therapy. The reports from all four experts were attached to the presentence investigation report.[3] Thus, evidence of Whipple's mental condition was offered and received for consideration at sentencing. We conclude that the trial court did not err in denying Whipple's motion for a further psychological evaluation for sentencing purposes.

## VI.

### EXCESSIVE SENTENCE

Where a sentence is within the statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion. *State v. Hedger*, 115 Idaho 598, 604, 768 P.2d 1331, 1337 (1989). A sentence may constitute a clear abuse of discretion if it is unreasonable upon the facts of the case. *State v. Broadhead*, 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992).

> "[A] term of confinement is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. A sentence of confinement longer than necessary for these purposes is unreasonable.

Such determinations cannot be made with precision. In deference to the discretionary authority vested in Idaho's trial courts, we will not substitute our view for

---

**3.** At trial, two defense psychologists testified to Whipple's diagnosis of PTSD with attendant dissociative states and also intermittent explosive disorder. The state's experts, Dr. Miller, a psychiatrist, and Dr. Hayes, a psychologist, disagreed with the defense psychologists' diagnoses, concluding that Whipple had personality disorders and was accustomed to beating his spouse. We also note that at sentencing, the district court discussed the psychological evidence and concluded that Dr. Miller's testimony was more persuasive—that Whipple did not have a psychological condition that could be considered a significant factor at sentencing.

that of a sentencing judge where reasonable minds might differ. An appellant must show that, under any reasonable view of the facts, his sentence was excessive in light of the foregoing criteria."

*Broadhead,* 120 Idaho at 145, 814 P.2d at 405, *quoting State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982).

Where an appellant asserts that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record and focus upon the nature of the offense and the character of the offender. *State v. Hernandez,* 121 Idaho 114, 118, 822 P.2d 1011, 1015 (Ct.App.1991); *State v. Reinke,* 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). With respect to sentences imposed under the Uniform Sentencing Act,

> the minimum period [of confinement] generally will be treated as the probable measure of confinement for the purpose of sentence review. By focusing on this period, we do not wholly disregard the aggregate length of the sentence, nor do we suggest that a prisoner will be *entitled* to parole when the minimum period has elapsed; but we do recognize that he will be *eligible* for parole at that time.

*State v. Sanchez,* 115 Idaho 776, 777, 769 P.2d 1148, 1149 (Ct.App.1989).

Whipple's minimum period of confinement is fifty years. Accordingly, Whipple must demonstrate that this fifty-year period was an abuse of the district court's discretion. Whipple was forty-six years old at the time of sentencing. Thus, we assume for purposes of sentence review that the fixed term of Whipple's sentence is tantamount to a fixed life sentence given his age. *See State v. Li,* 131 Idaho 126, 128 n. 2, 952 P.2d 1262, 1264 n. 2 (Ct.App.1998). The penalty for second degree murder is from ten years up to life imprisonment. I.C. §§ 18–4003, 18–4004.

Whipple had been planning to move to Ohio after his separation from his wife. After boarding the bus for Ohio, he jumped off at the next stop and asked Deborah Kay if he could come home. She permitted him to do so. Whipple bludgeoned her to death with a hammer after she decided that he should leave. Whipple's criminal record reflects a misdemeanor domestic violence incident in 1983, domestic violence and violation of a protection order in October of 1996 and the instant murder charge about a month later. Whipple attempted suicide in 1983 and was diagnosed with PTSD. The presentence investigator noted that Whipple is self-absorbed, more concerned about how he is affected by killing Deborah Kay than how his act affects others. Throughout the presentence interview, Whipple blamed his wife and children for their failure to look after his needs and accommodate his low stress tolerance. The presentence investigator recommended a lengthy period of incarceration. Dr. Miller's psychiatric evaluation reveals that although under the stress of incarceration, Whipple remains polite, cooperative and non-aggressive.

At sentencing, the court imposed a unified life term, with fifty years fixed. We cannot say that the court abused its discretion in imposing such a sentence in light of his conduct—the brutal bludgeoning of Deborah Kay following a lifetime of domestic violence. *See State v. Burdett,* 134 Idaho 271, 1 P.3d 299 (Ct.App.2000) (affirming judgment of conviction and sentence of fixed life for second degree murder); *Li,* 131 Idaho at 129, 952 P.2d at 1265 (given egregious nature of defendant's offenses, imposing the equivalent of a fixed life sentence was not an abuse of discretion).

## VII.

### CONCLUSION

The district court did not err in denying Whipple's motion to suppress, admitting the testimony of Peak and Michelle Whipple, refusing to give a requested involuntary manslaughter instruction, or denying Whipple's motion for a psychological evaluation for sentencing purposes. The court did not abuse its discretion at sentencing. Accordingly, the judgment of conviction and sentence are affirmed.

Chief Judge PERRY and Judge Pro Tem R.B. WOOD concur.