Carlos A. SANDERS, Appellant,

v.

UNITED STATES, Appellee.

No. 88–153.

District of Columbia Court of Appeals.

Argued July 11, 1989.
Decided Dec. 8, 1989.

---

Henderson Hill, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Sylvia Royce, U.S. Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Patricia L. Petty, Asst. U.S. Atty., were on the brief, for appellee.

Before ROGERS, Chief Judge, and NEWMAN and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

This case arises from the armed robbery of a neighborhood deli by two men wearing stocking masks, involving the non-fatal shooting of the deli's owner. Since we find that an inculpatory statement made by appellant was admitted in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we must reverse.

The context in which the challenged statement arose was as follows. Appellant was arrested on the morning of November 6, 1986, at his mother's home. After being advised of his rights from the PD 47 card, the police department's standard "rights card," appellant answered the four ques-

tions on the reverse side of the card in the affirmative, indicating that he had been fully apprised of his rights, and that he was willing to answer questions without having an attorney present.[1] Approximately thirty minutes later,[2] in the course of processing a 163 form [3], the detective asked appellant whether he wished to make a statement, and appellant declined. At the suppression hearing the detective explained this exchange as follows:

Q. When—what was it the defendant said when he declined to give a statement? How did he indicate that he did not want to give a statement?

A. When we—when we complete the report we asked if he wanted to make a statement about this, anything you want to say. If he says no, we indicate that the defendant did not want to make no statement.

. . . .

The Court: Did you regard his indicating no, that there wasn't anything that he wanted to say as in any way inconsistent with his responses on the PD 47?

The Witness: No, Sir.

The Court: Why not?

The Witness: Well, he had the option of making the statement or not. He said he didn't.

There is no testimony from the suppression hearing purporting to set forth defendant's exact remarks during the 163 processing. The 163 form bears the notation "the defendant did not want to make a statement about the robbery," without indicating whether appellant had simply replied in the negative to the detective's question, or whether appellant had made an affirmative assertion that he did not want to make a statement.[4]

---

1. The questions asked were: "Have you read or had read to you the warnings of your rights? Do you understand these rights? Do you wish to answer any questions? Are you willing to answer questions without having an attorney present?"

2. The record does not reveal what took place during this period.

3. This form bears the notation "Prosecution Report," and is "the last thing that is completed"

prior to taking a defendant to the central cellblock.

4. The detective's testimony is not clear in this regard either. E.g.:
   Q. It is true, is it not, on November 6, 1986, neither you nor anyone else from robbery squad sought to have Mr. Sanders do another written statement?
   A. I am sure we did.

The issue on this appeal arises because of what happened subsequent to the processing of the 163 form. Following appellant's refusal "to make a statement," while escorting appellant to the cellblock, the detective, without repeating appellant's *Miranda* rights and without making any effort whatsoever to clarify appellant's meaning with respect to his response during the 163 form processing, asked appellant whether he was going to let George Darby (another suspect) go free and take this by himself. Appellant responded, "I will take this by myself. I probably will only get about three years."[5] The government does not dispute that the detective's question here was the "functional equivalent" of interrogation, *see Rhode Island v. Innis*, 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *Wilson v. United States*, 444 A.2d 25, 28 (D.C.1982) (discussing *Innis* test; issue is whether police words or conduct were "reasonably likely to elicit an incriminating response"). The critical question is whether appellant, by communicating to the detective that he would not give a statement, thereby invoked his right to silence. *See Bliss v. United States*, 445 A.2d 625, 630 (D.C. 1982) *cert. denied*, 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983) (no need to reach question of whether police scrupulously honored right to remain silent if appellant never asserted right after waiver).

*Miranda v. Arizona, supra*, acknowledged both that an individual once apprised of his constitutional rights may effectively waive them, and that the waiver, once given, can be withdrawn. *See Miranda, supra*, 384 U.S. at 444–45, 86 S.Ct. at 1612–13 ("[i]f ... he indicates in any manner and at

any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.... The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries...."); *id.* at 473–74, 86 S.Ct. at 1627–28 ("[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease"); *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975) ("admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored' ").

The motions judge, in ruling appellant's statement admissible, reasoned that appellant was not asserting a right to silence, but rather was merely indicating that he did not wish to make a formal statement, since he had just made a six-page statement two days before, to which he had nothing to add. The court stated:

> The logical inference is that he had nothing further that he wished to say at that time beyond what he had already said, but that he remain [sic] free and willing to answer any further specific questions. Therefore, I don't find that the colloquy with Detective Jones, that he had with him on the 6th, concerning Mr. Darby, constituted an improper interrogation.

However, in making such a "logical inference" from an equivocal or ambiguous assertion, the motions judge failed to give full regard to the principles established in

Q. You asked—on November 6th, 1986, you asked Mr. Sanders?
A. I am sure we did.
Q. And he refused to give you one?
A. I am quite sure he did.
Q. And then you asked him those questions on the way down to the cellblock?
A. It wasn't a matter of asking 'cause he refused to give a statement. He said he would answer questions.

The mention of "another written statement" was a reference to a six-page statement given two days before, on November 4. This statement, which was apparently exculpatory, was not used at trial. Appellant had also been inter-

rogated on October 31, resulting in a brief proposed written statement, which appellant refused to sign. This statement was suppressed as the product of an illegal arrest.

The assertion that appellant said he would answer questions is apparently a reference to the *Miranda* waiver. It is not argued that there was any other affirmative assertion of willingness to respond to questions.

**5.** At trial, the detective made clear that prior to this exchange, the detective had told Sanders that he had been identified and accused as the person who robbed the store.

*Miranda* and its progeny in this jurisdiction. *See United States v. Alexander*, 428 A.2d 42, 51 (D.C.1981) (concluding, after reviewing exchange between appellee and the police, "[w]e thus disagree with the trial judge's conclusion that the appellee was not interrogated within the meaning of *Miranda* and that her rights were scrupulously honored").

▇▇ In the analogous *Miranda* area of right to counsel, the Supreme Court has expressly left open the question of what is required on the part of police when there is a request for or reference to counsel which is equivocal or ambiguous. *Smith v. Illinois*, 469 U.S. 91, 95–96 & n. 3, 105 S.Ct. 490, 492–493 & n. 3, 83 L.Ed.2d 488 (1984) (per curiam) (surveying the different approaches to the issue presented where request for counsel is equivocal). *See Connecticut v. Barrett*, 479 U.S. 523, 529 n. 3, 107 S.Ct. 828, 832 n. 3, 93 L.Ed.2d 920 (1987) (no need in circumstances of case "to address the question left open in [footnote 3 of] *Smith v. Illinois*"). The question before us, *i.e.*, what conduct of the police is required following an equivocal or ambiguous assertion of the right to remain silent, involves the same possible analytical approaches as those set forth in *Smith's* footnote three.

In *Ruffin v. United States*, 524 A.2d 685 (D.C.1987), *cert. denied*, 486 U.S. 2827, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988), we addressed the issue left open in *Smith*. We noted that some courts require that interrogation cease following any indication at all from the accused, however equivocal, that he or she might want counsel before continuing to answer questions. However, we observed, most courts have held that there is another permissible response to an equivocal request for counsel: a question, or series of questions, designed to clarify only whether the suspect does or does not want to consult with an attorney before continuing the interrogation.[6] Adopting the latter

approach, we concluded that "the appropriate response to an ambiguous or equivocal assertion of the right to counsel by an accused ... is a request by police interrogators for clarification." *Id.* at 700–01.

Here, as the motions judge noted, appellant's response to the question of whether he wanted to make a statement may have meant simply that he did not wish to make another formal, written statement, without implicating in any way his willingness to discuss the robbery in an oral dialogue. However, we cannot say that appellant's response cannot very well be construed differently. Given the clear ambiguity, and mindful of the argument that "to demand that it [the privilege] be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would subvert *Miranda's* prophylactic intent," *People v. Superior Court of Mono County*, 15 Cal.3d 729, 737, 125 Cal.Rptr. 798, 802–03, 542 P.2d 1390, 1395 (1975) (citation omitted); *Ruffin, supra*, 524 A.2d at 700–01 (taking note of this argument), we are unable to uphold the motions judge's ruling. In the circumstances here, prior to resuming questioning the detective should have ascertained what appellant meant by his arguably categorical refusal "to make a statement." *See, e.g., Thompson v. Wainwright*, 601 F.2d 768, 771–72 (5th Cir.1979) (limiting questioning after an ambiguous request for counsel only to an attempt to clarify that request); *State v. Moulds*, 105 Idaho 880, 888, 673 P.2d 1074, 1082 (Idaho Ct.App.1983) (adopting 5th Circuit's approach because it "occupies a sensible middle ground between, on one hand, giving 'talismanic effect' to any vague mention of an attorney and, on the other hand, insisting that accused persons in custody invoke their rights in language free from all possible ambiguity").

Here, in the aftermath of an exchange in which appellant may well have "indicat[ed] in [his own] manner ... that he wish[ed] to

---

6. Footnote three of the *Smith* opinion describes the cases as falling in three general categories, a third one being those courts "which have attempted to define a threshold standard of clarity for such requests," holding that requests falling below this threshold do not trigger the right

to counsel. Such an approach is not necessarily inconsistent with the majority rule followed in *Ruffin*. We need not dwell further on this point; by any reasonable standard, appellant's assertion here raises a serious issue of his meaning.

remain silent," *Miranda, supra,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28, the detective nevertheless proceeded as if the continued efficacy of appellant's waiver of his rights as noted on the back of the rights card had not been called into doubt. We therefore must hold that the motions judge erred in failing to suppress the incriminating statement uttered by appellant in response to the detective's question.[7]

 Nor can we say that the introduction of the statement was harmless beyond a reasonable doubt. *See Ruffin, supra,* 524 A.2d at 703 ("question is whether the violation of appellant's Fifth Amendment rights in obtaining his written statement was harmless beyond a reasonable doubt") (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). A thirteen-year-old customer in the store at the time of the crime, provided the sole eyewitness identification, whose reliability was subject to attack.[8] This evidence, even when coupled with proof that appellant's thumbprint was found on the drawer from the cash register of the store, found behind a nearby apartment building,[9] and with challenged testimony by appellant's half-sister that he had confessed to the robbery,[10] is simply not so "overwhelming," *see Ruffin v. United States, supra,* 524 A.2d at 703 (*Miranda* violation harmless since "[t]he government's evidence ... was overwhelming without the written state-

ment"), that we can say that there was not even "a reasonable possibility" that appellant's inculpatory statement contributed to his conviction. *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).[11]

*Reversed and remanded*

---

7. The government relies solely upon *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), in which questioning was permitted where the suspect invoked his right to counsel by refusing to make written statements without his attorney, but said he was willing to talk about the incident orally. However, there, as the Court specifically pointed out, Barrett's intentions were clear and unambiguous. *Id.* at 529 & n. 3, 107 S.Ct. at 832 & n. 3.

8. The trial judge himself commented, out of the jury's presence, that the government had presented "a very weak identification case."

9. The defense theory with respect to the fingerprint evidence was two-fold. First, the defense attempted to create some reasonable doubt as to whether Sanders' fingerprints were in fact found on the part of the cash register which was recovered outside the store, as opposed to some other part of the cash register. Secondly, Sanders took the stand at trial and testified that his fingerprints may have gotten on the cash reg-

ister because he had been in the store in the afternoon and had paid for an item he purchased by placing his money "on the front of the cash register."

10. The half-sister's testimony on this point was not at all strong. She first flatly denied that Sanders had told her anything about the robbery. It was only after she was impeached with her prior inconsistent statement to the grand jury that she ultimately answered "yes" to the question of whether her brother had told her "that he had done the robbery, but the police couldn't prove it." Furthermore, there was an issue as to whether the half-sister was biased in that she was trying to cover up for her boyfriend who had been implicated in the robbery.

11. Since reversal is required for the *Miranda* violation, we do not reach appellant's other assignments of error.