**Aundrey D. BURNO, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 97–CF–1698, 06–CO–488.**

District of Columbia Court of Appeals.

Argued April 30, 2008.
Decided Aug. 7, 2008.

Sydney Jean Hoffmann for appellant.

Florence Pan, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Elizabeth Trosman, and Glenn Kirschner, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, Associate Judge, FARRELL, Associate Judge, Retired,* and TERRY, Senior Judge.

FARRELL, Associate Judge, Retired:

A jury convicted appellant (Burno) of armed assault with intent to rob, assault with a dangerous weapon, and related weapons offenses, crediting evidence that he had shot uniformed police officer Gerald Anderson in the neck in September 1995 while intending to rob the officer of his Glock service pistol.

Burno's main argument on appeal is that the trial court erred in not suppressing his videotaped confession, because police detectives (a) ignored what he contends was an unambiguous assertion of his right to end the custodial interrogation, or (b) failed to clarify whether he was asserting that right before questioning him further. Burno, however, did not unequivocally assert his right to end the interrogation, and under *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the police were not obliged to clarify his ambiguous responses before questioning him further about the crime. As we find no reversible error otherwise, we affirm the convictions.

## I. The Trial Evidence

MPD Officer Anderson had just left a convenience store when he felt something strike his neck like a "sledgehammer" and knock him to the ground. He had been hit by a bullet from a .380 caliber automatic or semiautomatic pistol. Although Anderson did not see the shooting itself, he later identified Burno from photographs—he was "85 percent certain"—as the lone person he had seen standing behind him on the sidewalk moments after the assault, looking "dumbfounded" and hiding his right hand behind his leg. Besides this identification, the prosecutor introduced in evidence multiple statements and writings by Burno admitting his responsibility for the shooting. In particular, a month after the assault he told a friend of his mother's that he had "shot a police because the [officer] was in his way and he wanted [the officer's] gun." Later, while in jail following his arrest, he wrote a letter to Anthony Willis (an early suspect in the shooting) saying that "[t]hey got me over here for the police that I shot,"[1] and also while in jail, he wrote what he later claimed were rap songs in which he "remember[ed] when we shot at rookie cops for their Glock" and complained of his "right hand man turn[ing] snitch."

Important evidence against Burno, however, was his custodial confession to police detectives on January 16, 1996, first orally and then in a videotaped interview that

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

1. Willis further testified that in September 1995 Burno had told him orally that he "busted [shot] the police" (describing the officer fall to his knees) and that Robert McFarlin had been with him at the time and given him the ".380" that Burno used to do the shooting.

was played to the jury. In both versions Burno confessed that he had shot the officer once and had tried to do so again (his gun had jammed); that he had done so intending to steal the officer's Glock service pistol; that Robert McFarlin, who had accompanied him to the scene and given him the .380 caliber pistol he used to shoot the officer, was in the convenience store at the time of the shooting; and that Burno and McFarlin had fled the scene together in a burgundy Nissan.[2]

## II. The Videotaped Confession

Before the detectives questioned Burno on January 16, they told him that he was being charged with the shooting of Officer Anderson, and he waived in writing his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He does not challenge the validity of the waiver on appeal.[3] Thereafter, the detectives and an FBI agent interrogated him twice, recording the second interview on videotape. The trial judge found that, before the first round of questioning, Burno was "cocky and self-assured," saying "he had no problems talking to [the police] because he knew what he was doing" and "there wasn't anything [they] could pull over on him." In the first interview, Burno freely admitted that he had shot the police officer. Before the videotaped interview, he acknowledged the previous waiver of his *Miranda* rights.

Burno began the taped interview by describing the events in guarded fashion: "We drove to ... the convenience store. We get out the car, go in the store. See a police come out, gun get fired. Police get shot in the neck." He acknowledged too that the person he had been with that evening was his "best friend, ... known as

EZ," but when a detective asked him EZ's full name, he stated: "Rather not say," though when the detective then asked if it was not "fair to say that [EZ's] ... true name is Robert McFarlin," he replied "Sure." Answering further questions, Burno explained that he and McFarlin had come to the convenience store in a red Nissan and had seen a police officer inside, but when asked who specifically had entered the store, he again stated, "I'd rather not say." He acknowledged having "go[ne] through this [recital of events] before" with the detectives and having spoken "truthful[ly]"; but when a detective asked if he had not said "before that EZ went into the store to buy blunts," he answered a third time: "I'd rather not say. Said we went into the store. Cannot say who went in the store. I'm saying ... only ... it was two of us."

The detective then asked if it was not true that "you were armed with a gun at that point," and Burno answered "yeah," admitting that it was a .380 caliber, blackish-gray automatic-type pistol. He again described the shooting ("the officer comes out of the store, ... say[s to Burno] ... how you doing young man. Gun get fired. I hear a gunshot. See police fall."), and when the detective asked, "the gunshot comes from where, Andre?," he answered: "From a gun. The gun, the, I just heard the gunshot...." Not satisfied, the detective asked if the gun that went off was the .380 in his possession, to which Burno first answered, "It's not my gun that went off." The questioning continued:

> [Detective]: We're here just for the truth, Andre. You acknowledged to me a little bit ago that what you told agent

---

2. Other witnesses confirmed the link of a burgundy Nissan Sentra to Burno and McFarlin at the time.

3. Burno acknowledged at the suppression hearing that he had executed PD–47 "rights cards" on repeated past occasions and that his attorneys in those cases had told him not to talk to the police.

Kossler and Detective Irving and myself was true and accurate. I wanna know if the gun that went off is the gun that you had in your possession, as you stated before.

[Burno]: I'd rather not say.

[Detective]: No, you don't want to say. Okay.

The detective then returned to Burno's oral confession and asked if he remembered stating why the shooting had happened. Burno first said that he did not recall why, but when reminded of his earlier admission that he "had a desire to get ... a policeman's Glock nine millimeter" and asked "[w]as that the reason why the officer got shot?", he answered "yes." In answering further questions, he admitted he had "pulled the trigger to shoot the officer," having told others beforehand that he "want[ed] ... a police Glock," and that he fled the scene of the shooting with EZ. During the rest of the interview, he expressed reluctance to say that EZ had joined him in "pee[ing] on" or dumping the .380 pistol in water to remove fingerprints ("Rather not say who done it.") and was similarly unwilling to talk about an earlier, unrelated altercation he and EZ had been involved in ("Rather not say") or to admit the kind of guns he had had in his possession on other, unrelated occasions ("Rather not say.... I just had several guns.").

### III. Discussion

On this record, Burno argues that even though he waived his right to silence initially, he changed his mind and made clear his desire to end the questioning during the videotaped interview, and that the police then failed to "scrupulously honor[ ]" his choice. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Alternatively, he argues that his expression of a desire to stop the questioning was at least ambiguous, and that the police were obliged to clarify his intention before continuing to question him about

the crime, citing *Sanders v. United States*, 567 A.2d 55, 58 (D.C.1989). We consider these arguments in succession, and reject both.

### A.

The warnings required by *Miranda* must be given, and the rights they protect voluntarily waived, before a suspect's statements made during custodial interrogation may be admitted in evidence. *Miranda*, 384 U.S. at 467, 476, 86 S.Ct. 1602; *see Dickerson v. United States*, 530 U.S. 428, 431, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Waiver of *Miranda* rights does not bar a suspect from later asserting them. *See Edwards v. Arizona*, 451 U.S. 477, 478–79, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If the suspect invokes his right to silence at any time, his subsequent statements are admissible only if "his 'right to cut off questioning' was 'scrupulously honored'" by the interrogators. *Mosley*, 423 U.S. at 104, 96 S.Ct. 321 (quoting *Miranda*, 384 U.S. at 474, 479, 86 S.Ct. 1602). In the wake of *Mosley* and *Edwards*, this court joined others in holding that an ambiguous or equivocal invocation of the right to silence or to counsel required interrogators to cease questioning except for a "limited inquiry" designed to clarify whether the suspect was invoking the right. *Sanders*, 567 A.2d at 58 (right to silence); *Ruffin v. United States*, 524 A.2d 685, 701 (D.C.1987) (right to counsel).

In *Davis, supra,* however, the Supreme Court rejected this "clarification rule" in the context of a claimed assertion of the right to counsel. The Court held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S.

at 459, 114 S.Ct. 2350. Although noting that "it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney," the Court "decline[d] to adopt a rule requiring officers to ask clarifying questions." *Id.* at 46, 114 S.Ct. 2350; *see also Riley v. United States,* 923 A.2d 868, 882 (D.C.2007) (applying *Davis* to ambiguous invocation of right to counsel). As stated earlier, Burno argues that the *Davis* holding should not be applied to the invocation of the right to silence (rather than counsel), a point we consider in part B, *infra.* But because that issue would be moot if any of his videotaped admissions were made after he unambiguously sought to "cut off questioning," *Miranda,* 384 U.S. at 474, 86 S.Ct. 1602, we address the latter point first.[4]

■ That inquiry, the Supreme Court said in *Davis,* is an "objective" one:

[A] statement either is an [unambiguous] assertion of the right ... or it is not. Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

*Davis,* 512 U.S. at 459, 114 S.Ct. 2350 (citations and internal quotation marks omitted). None of Burno's videotaped statements met this "requisite level of clarity." *Id.* In arguing to the contrary, he asserts essentially three things: first, his statement almost at the beginning that he would "rather not say" EZ's last name

signalled to reasonable interrogators that he was no longer willing to submit to questioning; second, even if that is not so, when he re-expressed his unwillingness to talk in response to the critical question of whether he had fired his gun at the officer, the police assuredly knew he did not want to incriminate himself and so answer further questions; and third, the sheer number of instances—eight in all—when he declined to answer particular questions evinced a pattern of unwillingness to speak that should have been clear to the police before he significantly inculpated himself. These arguments are unpersuasive.

Burno's mode of speech ("I'd rather not say") was not by itself ambiguous, as the government concedes.[5] A suspect's statement to police that "I'd rather not answer questions" or "I'd rather not talk to you" almost certainly would be deemed an unequivocal assertion of the right to remain silent. Burno, however, did not once assert the right in that general a fashion. His first demurral, to the question of EZ's "full name," would not reasonably have impressed interrogators as more than an unwillingness to link Robert McFarlin to the events, a reluctance he quickly overcame, at least partly ("Is it fair to say that his ... name is Robert McFarlin?" "Sure."). His unwillingness to incriminate McFarlin continued ("Who goes in the store?" "I'd rather not say.... [I]t was two of us."), but he did not similarly withhold incriminating facts about himself: he admitted that he had been armed with a .380 pistol as the officer left the convenience store and addressed him, at which point "a gun[, t]he gun " (emphasis added)

---

**4.** The government does not assert that, assuming Burno asserted his right unequivocally, the police nonetheless complied with *Mosley, supra.* The government does argue that Burno conceded the issue of ambiguity *vel non* in the trial court, but reading his written submissions to that court as a whole, we

disagree—as did, apparently, the trial judge since she examined and resolved the issue on the merits.

**5.** *Cf.* H. MELVILLE, *"Bartleby the Scrivener "* (1853) (passim) ("I would prefer not to.").

was fired and the officer fell. Burno's answers thus were the classic illustration of a suspect willing to answer some questions but not others, conveying an at least ambiguous message to interrogators about his desire to remain silent. Summarizing decisions on this subject, Professor La-Fave has stated that, although "any declaration of a desire to terminate the [police] contact or inquiry ... should suffice, ... an unwillingness ... to respond to a particular inquiry ... is not a general claim of the privilege." 2 W. LaFave, Criminal Procedure § 6.9(g), at 853–54 (3d ed.2007). Numerous cases have recognized this distinction. *See, e.g., State v. Marden,* 673 A.2d 1304, 1310 (Me.1996) (accused's "responses viewed individually only indicated his desire not to answer the particular question asked, not that he wanted the questioning to stop"); *State v. Bacon,* 163 Vt. 279, 658 A.2d 54, 66 (1995) ("A defendant may express an unwillingness to discuss certain subjects without indicating a desire to terminate an interrogation already in progress"); *People v. Michaels,* 28 Cal.4th 486, 122 Cal.Rptr.2d 285, 49 P.3d 1032, 1046 (2002) (suspect "did not assert a right to refuse to answer any questions, ask that questioning come to a halt, or request counsel"); *State v. Matson,* 260 Kan. 366, 921 P.2d 790, 797–98 (1996) (accused declined to answer questions about whether he had told a friend that he had committed the murders, "but did not express a desire to terminate questioning altogether"); *United States v. Thomas,* 358 F.Supp.2d 1100, 1101 (M.D.Ala.2005) (suspect's refusal to "say where I got [the money orders]" was not a clear indiction "that he wished questioning as a whole to cease"). LaFave cites from the cases many formulations by which lay suspects have been held to express a desire to cut off questioning, LaFave § 6.9(g) at 853–54 n. 149, but all entail a level of generality—a desire to end all questioning—beyond Burno's expression of unwill-ingness to answer some questions while answering others.

Nor does the analysis change because Burno at first refused to make the critical admission that he had fired the gun. An unwillingness to incriminate oneself is not the same as a refusal to be questioned further. Burno's pattern up to that point, as we have seen, was to answer some questions, including those tending significantly to incriminate him, while not answering others. These "circumstances leading up to" his stated unwillingness to admit the shooting "render[ed] it ambiguous" as an assertion of rights, *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), and permitted the detectives to keep questioning him provided that, under *Davis,* they had no duty to clarify his responses.

Moreover, the fact that Burno expressed unwillingness to answer questions "[o]n eight separate occasions," as his brief emphasizes (at p. 24), adds no force to the claim of unambiguity. Just as several of his early demurrals reasonably signalled a reluctance to implicate McFarlin, so the later ones related to who—Burno, McFarlin, or both—had sought to erase fingerprints from the gun or made clear only his unwillingness to discuss an unrelated altercation or admit what kind of guns he regularly carried. These answers, too, were "question specific," *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456, 470 (1995), and neither individually nor together were they an unequivocal assertion of his right to end the questioning.

Burno cites *United States v. Jumper,* 497 F.3d 699 (7th Cir.2007), and related cases, for the principle that the right to remain silent is implicated by an accused's refusal to answer specific questions (including, as in *Jumper,* by expressions such as "I'd rather not say"). *See also, e.g., Grieco v. Hall,* 641 F.2d 1029, 1034 (1st

Cir.1981) ("*Miranda* protections apply equally to refusals to answer specific questions."). But those decisions present the very different issue of whether a prosecutor may *comment* on a defendant's selective exercise of his right not to answer as evidence of guilt, *see generally Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Jumper*, 497 F.3d at 704 (noting court's previous holding that "the right to remain silent ... attaches to a defendant's refusal to answer a specific question, *and therefore* the Government may not comment on the defendant's refusal to answer a specific question at trial" (emphasis added)). They do not address the issue here of when a suspect has unambiguously asserted his right to cut off questioning so as to invoke the command of *Mosley, supra*. Although "a suspect need not rely on talismanic phrases or any special combination of words to invoke the right of silence," *Bobo v. Kolb*, 969 F.2d 391, 396 (7th Cir.1992), he must do so unequivocally—by any of manifold lay formulations available to him, *see* LaFave § 6.9(g), *supra*—to bar further questioning under *Davis*. Burno's selectively expressed unwillingness to answer questions did not reasonably convey "in the circumstances,"[6] *Davis*, 512 U.S. at 459, 114 S.Ct. 2350, a desire "to terminate the contact or inquiry." LaFave § 6.9(g), *supra*.

This is not to deny, of course, that at a sufficient level of generality an accused may selectively assert his right of silence so as to bring *Mosley* into play. He presumably may, for example, agree to answer booking-type questions (name, date of birth) but refuse questioning about the incident for which he is in custody. He

may agree to discuss his immigration status but refuse to be questioned about his actions on a given occasion. *See United States v. Soliz*, 129 F.3d 499, 504 (9th Cir.1997) (in case charging smuggling of aliens, police unlawfully "ignored suspect's restriction o[f] the subject matter of questioning" solely to issue of his citizenship). And, too, he may agree to discuss a matter informally, but draw the line at formal recording of his answers. *See Arnold v. Runnels*, 421 F.3d 859, 864 (9th Cir.2005) (refusing to answer on tape). But none of these situations resembles this one. Burno waived his rights and agreed to talk about the shooting; he began answering questions, both informally and on videotape, incriminating himself significantly ("We get out the car ... gun get fired. Police get shot ..."); and he then balked only at answering particular questions. That is exactly the kind of ambiguous situation this court and others required police to clarify before interrogating further— until *Davis* held otherwise.

### B.

■ Burno's secondary argument is that the rule of *Davis* relieving police of a duty to clarify ambiguous assertions of *Miranda* rights should not extend to the exercise of the right to be silent, "a fundamental constitutional right" in contrast to the "derivative" or only "prophyla[ctic]" right to counsel under the Fifth Amendment (Br. for App. at 33). Any validity this distinction based on a ranking of Fifth Amendment protections may have had before *Dickerson v. United States, supra*, however, is undermined by that decision holding that the preinterrogation warnings *Miranda* requires, including the right to the presence of counsel, are "constitution-

---

**6.** Although those "circumstances" arguably would include—as Burno's brief suggests—his young age at the time (sixteen) and relative lack of education, they would also include the fact found by the trial judge that, appearing cocky and self-assured, he professed to knowing "what he was doing" in dealing with the police and was confident that they "could pull [nothing] over him."

ally based." 530 U.S. at 440, 120 S.Ct. 2326. Moreover, although some lower federal courts have left open the issue of whether *Davis* applies beyond the right-to-counsel setting, no decision cited to us nor any we can find has embraced the distinction Burno advocates. Instead, courts deciding the issue after *Davis* have uniformly applied the same test to a suspect's ambiguous assertion of the right to cut off questioning as to the right to counsel.[7] In *Davis,* the Court reaffirmed the need for "a bright line" rule—already established by *Edwards v. Arizona*—"that can be applied by [police] officers in the real world of investigation and interrogation without unduly hampering the gathering of information." 512 U.S. at 461, 114 S.Ct. 2350. Like the other courts cited, we believe that this concern for " 'clarity and ease of application' of a bright line rule ... applies with equal force to the invocation of the right to remain silent," *Coleman, supra* note 7, 30 F.3d at 1424 (quoting *Davis* ), and that the Supreme Court would so hold. *See also Sanders,* 567 A.2d at 58 (applying former rule of "clarification only" without differentiation to both right to silence and right to counsel assertions).

Consequently, we follow *Davis* and hold that Burno's claim that he asserted his right to silence was obliged to meet the test of that decision, rather than the test we formerly applied in *Sanders. See Kleinbart v. United States,* 604 A.2d 861, 870 (D.C.1992) ("When intervening constitutional rulings necessitate a change in prior law, a division of this court is empowered to recognize that earlier decisions no longer have force.").

Burno's videotaped confession was properly admitted.

## IV.  Other Claims

■ We deal more briefly with Burno's two remaining claims of error. The first relates to a statement Robert McFarlin had been overheard making soon after the shooting of Officer Anderson. According to proffered defense eyewitness Keisha Haggins, McFarlin shot Darrell Izzard one day in September 1995 in Hickory, North Carolina, then went down the street and boasted to Izzard's brother and friends, "I done shot Darrell and a cop in [D.C.]. Look, I even walk in Hickory and these punk ass cops do nothing.... If they step

---

7.  *See United States v. Teleguz,* 492 F.3d 80, 88 (1st Cir.2007); *United States v. Hurst,* 228 F.3d 751, 759–60 (6th Cir.2000); *United States v. Banks,* 78 F.3d 1190, 1197–98 (7th Cir.), *vacated and remanded on other grounds sub nom. Mills v. United States,* 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996); *Simmons v. Bowersox,* 235 F.3d 1124, 1131 (8th Cir.2001); *United States v. Nelson,* 450 F.3d 1201, 1211–12 (10th Cir.2006); *Coleman v. Singletary,* 30 F.3d 1420, 1423–24 (11th Cir.1994). *See also United States v. Cooper,* 85 F.Supp.2d 1, 20–21 & 21 n. 28 (D.D.C. 2000).

Numerous state court decisions are to the same effect. *See, e.g., Bowen v. State,* 911 S.W.2d 555, 556 (Ark.1995); *People v. Arroya,* 988 P.2d 1124, 1131 (Colo.1999); *State v. Owen,* 696 So.2d 715, 717–18 (Fla.1997); *State v. Whipple,* 134 Idaho 498, 5 P.3d 478, 482–84 (2000); *State v. Donesay,* 265 Kan. 60, 959 P.2d 862, 871–72 (1998); *State v. Robert-*

son, 712 So.2d 8, 31 (La.1998); *State v. King,* 708 A.2d 1014, 1017 (Me.1998); *State v. Williams,* 535 N.W.2d 277, 284 (Minn.1995); *In re Frederick C.,* 8 Neb.App. 343, 594 N.W.2d 294, 302 (1999); *People v. Cohen,* 226 A.D.2d 903, 904, 640 N.Y.S.2d 921 (N.Y.App. Div.1996), *rev'd on other grounds,* 90 N.Y.2d 632, 665 N.Y.S.2d 30, 687 N.E.2d 1313 (1997); *State v. Golphin,* 352 N.C. 364, 533 S.E.2d 168, 225 (2000); *State v. Greybull,* 579 N.W.2d 161, 163 (N.D.1998); *State v. Murphy,* 91 Ohio St.3d 516, 747 N.E.2d 765, 779 (2001); *State v. Aleksey,* 343 S.C. 20, 538 S.E.2d 248, 253 (2000); *Dowthitt v. State,* 931 S.W.2d 244, 257 (Tex.Crim.App.1996); *State v. Galli,* 967 P.2d 930, 935 n. 4 (Utah 1998); *State v. Bacon,* 163 Vt. 279, 658 A.2d 54, 65 (1995); *Midkiff v. Commonwealth,* 250 Va. 262, 462 S.E.2d 112, 116 (1995); *State v. Ross,* 203 Wis.2d 66, 552 N.W.2d 428, 429 (Ct.App.1996).

to me, I'll shoot them too." Burno requested admission of this hearsay statement (McFarlin did not testify) as a declaration against penal interest. Applying the standards set forth in *Laumer v. United States*, 409 A.2d 190 (D.C.1979) (en banc), the trial judge excluded it after finding that it lacked "corroborating circumstances clearly indicat[ing its] trustworthiness." *Id.* at 199. McFarlin, the judge reasoned, "had every reason to lie" at the time, having just shot Izzard and wanting to "intimidate" the victim's family and friends. She pointed further to the ample evidence establishing that McFarlin had been "in the [convenience] store on videotape at the time of the shooting."

In *Laumer*, this court cited the "significant burden" which the proponent of a declaration against penal interest must meet to justify its admission. *Id.* at 200. We agree with the trial judge's reasons for excluding McFarlin's statement. It was not made to persons "whom he thought he could trust," *id.* at 201, a good indicator of reliability; and conversely, it was not made to a police officer such that "the declarant may be assumed to have been immediately aware of the consequences of [his] statement." *Id.*[8] Further, McFarlin was placed in the store at the time of the shooting both by Detective Wade, who had met him before and recognized him in the store surveillance video, and by Burno in his confession. (McFarlin, too, in succeeding statements to the police, had said he was in the store at the time.).

█ But even if the judge had erred in refusing to admit the hearsay statement,

Burno would not obtain reversal. The sheer number of confessions he made, starting with his repeated admissions to the police but including also his statements to Catrina Edmonds, his oral and written statements to Anthony Willis, and his jailhouse writings, when combined with Officer Anderson's "85 percent certain" identification of him as the lone person standing behind him seconds after the shooting, all make any error in the exclusion of McFarlin's statement harmless. *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

█ Burno's remaining assignment of error is that the judge erroneously failed to prevent a detective from testifying, and the prosecutor from arguing, in a manner "suggest[ing]" that McFarlin had named Burno as the person who shot Anderson in interviews with the police. Burno argues that these suggestions were hearsay and a violation of his Sixth Amendment right to confront an accuser. But he did not object to them on either ground at trial. Reviewing for plain error, *see United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), we again find no basis for reversal.

Detective Will testified that when he interviewed McFarlin in North Carolina, McFarlin did not implicate Anthony Willis (whom the police first suspected) in the shooting, and that McFarlin had told him "who was involved in the incident." When the prosecutor then asked whom McFarlin had identified, the judge sustained Burno's objection.[9] Thus, the jury heard no state-

---

**8.** Haggins testified that a police officer was "like two blocks up [the street] in his car" at the time McFarlin made his statement, but nothing implied that the officer could hear the utterance or that McFarlin was aware that he could.

**9.** That objection, which the judge sustained, did not preserve the argument Burno now

makes for the first time, which is that Detective Will's testimony generally about the McFarlin interview—and the prosecutor's reference to the interview in opening statement—were veiled hearsay suggestions that McFarlin had named Burno. Burno gave no indication to the judge that preventing the detective's answer to the prosecutor's ques-

ment by McFarlin incriminating Burno, and neither in questioning other witnesses nor in closing argument did the prosecutor seek to enlist McFarlin as a hearsay witness against Burno. Given the powerful evidence from Burno's own mouth identifying him as the shooter, he cannot fairly argue that any muted suggestion that McFarlin too had incriminated him breached his substantial rights or seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Olano*, 507 U.S. at 732–36, 113 S.Ct. 1770.

*Affirmed.*

RUIZ, Associate Judge, concurring:

I agree with the majority that, having initially waived his *Miranda* rights and given a number of incriminating answers, appellant's responses ("I'd rather not say") to several questions did not convey with sufficient clarity to the police that he wished to invoke his Fifth Amendment right to stop the interrogation. I also agree that when the police reasonably are uncertain as to whether a suspect wishes a proper ongoing interrogation to stop, the rule in *Davis* should be extended so that the police do not have an obligation to clarify what the suspect means. *See Davis v. United States*, 512 U.S. 452, 459–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (no need to clarify ambiguous assertion of right to counsel).

I write separately to make clear what this case does not present and we consequently are not deciding. Appellant has not argued that he selectively invoked the right to remain silent (for example, as to EZ's involvement in the crime),[1] that the police failed to scrupulously honor that request, and that he was prejudiced as a

result of the police's repeated questioning about a discrete subject matter that he had clearly signaled was off limits. This is significant for several reasons.

First, a suspect may selectively invoke the Fifth Amendment right to silence, by agreeing to answer some questions but not others, and such a selective invocation must be "scrupulously honored" by the police just as in the case where a suspect invokes the right not to answer any question. *See Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) ("Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation."); *United States v. Soliz*, 129 F.3d 499, 504 (9th Cir.1997) (where suspect charged with transporting illegal aliens agreed to be questioned only about his citizenship, such "statement constituted an unequivocal invocation of [his] right to remain silent on all issues, except his citizenship"). Of course, just as there might be inherent ambiguity about a suspect's intent to bring an interrogation to an end once he has waived his *Miranda* rights and answered a number of incriminating questions—as in this case—there also could be ambiguity in a situation where a suspect is willing to answer some questions but not others. These are highly fact-bound issues that can be answered only in the context of a particular interrogation as there is no single talismanic formulation effective to invoke the Fifth Amendment. The question in all cases is whether "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking

---

tion was not adequate to forestall any hearsay or constitutional error.

1. I do not mean to suggest that on this record appellant could have successfully made such

a claim, only to clarify the contours of the issue as presented to the court and decided in this appeal.

the right...." *Davis*, 512 U.S. at 456, 114 S.Ct. 2350.

Second, there is reason to proceed cautiously in limiting any rule that is solicitous of the Fifth Amendment rights identified in *Miranda*. In refusing to extend the rule in *Edwards* that questioning must cease upon invocation of the right to counsel, *see Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), to situations where the assertion is ambiguous, *Davis* viewed such an extension as a "third layer of prophylaxis" to protect a right to counsel that the Court had established in *Miranda* "even though the Constitution does not provide for such assistance." 512 U.S. at 462, 114 S.Ct. 2350; *see Arizona v. Roberson*, 486 U.S. 675, 688, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (Kennedy, J., dissenting), *quoted in Davis*, 512 U.S. at 459–60, 114 S.Ct. 2350 ("[T]he rule of *Edwards* is our rule, not a constitutional command; and it is our obligation to justify its expansion."). But that view of *Miranda's* protections was rejected by the Court's more recent holding that "*Miranda* announced a Constitutional rule...." *Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Therefore, our reliance on *Davis* to conclude that police also have no duty to stop questioning and clarify a suspect's ambiguous statement to determine whether he chooses to invoke his Fifth Amendment right to silence, should be on as narrow a ground as possible to decide the case before us. This case does not present a case of a clear, but selective, invocation of the Fifth Amendment.

Third, the reason for the *Davis* rule may not apply with equal force where a selective invocation has clearly been made, and ignored by the police. In *Davis*, the Court explained that where there is ambiguity as to whether a suspect has invoked the right, the police have no duty to cease questioning because it would transform the *Mi-*

*randa* safeguards into wholly "irrational obstacles to legitimate police investigative activity." *Davis*, 512 U.S. at 460, 114 S.Ct. 2350 (quoting *Mosley*, 423 U.S. at 102, 96 S.Ct. 321). But that the police have no duty to interrupt a legitimate investigation to clarify factually ambiguous situations does not negate that when a suspect has clearly invoked the right to remain silent as to selected subject, the police are bound to honor that selective invocation of rights. *See* 2 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 6.9(g), at 855–56 (3d ed. 2007) ("[I]f the defendant 'clearly and unequivocally invoked his *Miranda* rights selectively,' that is a sufficient invocation of *Miranda* with respect to the specific situation covered by the invocation." (citing *Arnold v. Runnels*, 421 F.3d 859 (9th Cir. 2005))). If the police do not honor such a selective invocation, the investigation ceases to be "legitimate," which eliminates the leeway *Davis* allowed for "legitimate investigative activity." *Davis*, 512 U.S. at 460, 114 S.Ct. 2350; *cf. Stewart v. United States*, 668 A.2d 857, 865 (D.C.1995) ("The Court in *Davis* was concerned with the predicament of police officers faced with ambiguous or equivocal statements. A police officer who *understands* a statement as a clear invocation of the right is in no position to plead such a quandary and should not benefit from a rule designed to avoid it."). Where the obligation to honor a selective invocation of the Fifth Amendment is breached, the usual legal consequences follow: exclusion of evidence tainted by the violation and prohibition of comments or inferences from a suspect's valid assertion of a constitutional right.

For these reasons I write separately to define specifically the issue that has been presented to us and that we decide today.